IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

KIMBERLY J. SCOGGINS,

     Plaintiff,

   v.

FLOYD HEALTHCARE MANAGEMENT
INC., DR. KEVIN HARDWELL,
KURT STUENKEL, DR. JOSEPH BIUSO,
and DR. LEE BOULDIN,

     Defendants.

CIVIL ACTION FILE NO.

4:14-CV-00274-HLM-WEJ

## FINAL  REPORT  AND  RECOMMENDATION

There is an epidemic of prescription drug abuse in the United States.  (See http://nationalrxdrugabusesummit.org, last visited June 9, 2016.)   One of the causes is that patients become addicted to medications prescribed by their doctors. (See http://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm, last visited June 9, 2016.)   This case was brought by one such patient, and raises the question whether her former employer, Floyd Healthcare Management, Inc. ("Floyd"), and some of her former co-workers, successfully navigated the various federal and state laws implicated when they ostensibly sought to help her.

Plaintiff, Kimberly J. Scoggins, believes that they did not, and thus filed this action against Floyd, its Chief Executive Officer (Kurt Stuenkel), and three of its physicians (Drs. Lee Bouldin, Kevin Hardwell, and Joseph Biuso), alleging federal claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 et seq.,[1] and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and state law claims for negligence per se, violation of the statute creating Georgia's Prescription Drug Monitoring Program ("GPDMP"), breach of contract/stubborn litigiousness, and invasion of privacy/wrongful disclosure.  She seeks back pay, reinstatement and/or front pay, compensatory damages, liquidated damages, punitive damages, and attorneys' fees and costs.  (Second Am. Compl. [103] ¶ 1.)

After an extended period of discovery, this matter is before the Court on cross-motions for summary judgment filed (1) by Dr. Bouldin [174], Dr. Hardwell [175], and Dr. Biuso [176] (the "defendant doctors" or "DD"); (2) by Ms. Scoggins [190]; and (3) by defendants Floyd and Stuenkel [191] (the "Floyd

---

[1] "Congress made significant changes to the ADA by enacting the ADA Amendments Act of 2008 (the "ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, which became effective on January 1, 2009."  Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1267 (11th Cir. 2014).  Although plaintiff alleges in Counts III-VI that Floyd violated the ADAAA, the Court refers to these as ADA claims.

defendants" or "FD").  In support of these motions, the parties filed 444 pages of supporting, responsive, and reply briefs.  Upon review of those briefs and the parties' proposed facts (discussed infra), for the reasons explained below, the undersigned **RECOMMENDS** that:

defendant Dr. Bouldin's Motion for Summary Judgment [174] be **GRANTED IN PART** and **DENIED IN PART**;

defendant Dr. Hardwell's Motion for Summary Judgment [175] be **GRANTED**;

defendant Dr. Biuso's Motion for Summary Judgment [176] be **GRANTED**;

plaintiff Kimberly J. Scoggins's Motion for Summary Judgment [190] be **DENIED**;

defendant Stuenkel's Motion for Summary Judgment [191] be **GRANTED**; and

defendant Floyd's Motion for Summary Judgment [191] be **GRANTED IN PART** and **DENIED IN PART**.

## I.    STATEMENT OF FACTS

To assist with framing the undisputed material facts, Local Rule 56.1 requires the filing of certain documents along with a summary judgment motion. The Court lists those filings below, organized by movant.

3

Ms. Scoggins as movant filed a statement of undisputed material facts. (See Pl.'s Substitute Statement of Undisputed Material Facts as to Which There is no Genuine Issue to be Tried ("PSMF") [214-1].)[2] Both groups of respondents submitted responses thereto. (See Def. Doctors' J. Resp. to Pl.'s Statement of Material Facts Not in Dispute ("DDR-PSMF") [217-1]; [Floyd Defs.'] Resp. to Pl.'s Statement of Material Facts Not in Dispute ("FDR-PSMF") [223-1].) As allowed by the Local Rules, the defendant doctors submitted a statement of additional facts which they contend are material and present a genuine issue for trial. (See Def. Doctors' J. Statement of Additional Material Facts Not in Dispute ("DD-SAMF") [217-2].)[3] Plaintiff filed a response thereto. (See Pl.'s Resp. to Def. Doctors' J. Statement of Additional Material Facts Not in Dispute ("PR-DD-SAMF") [241].)

As movants on their Motions, Drs. Bouldin, Hardwell, and Biuso filed a joint statement of proposed undisputed facts. (See Defendant Doctors' Joint Statement of Material Facts Not in Dispute ("DDSMF") [197].) Plaintiff submitted a response. (See Pl.'s Resp. to Def. Doctors' J. Statement of Material Facts Not in Dispute ("PR-DDSMF") [210].) Ms. Scoggins also submitted a

---

[2] PSMF replaces the one plaintiff originally filed [193], which contained a typographical error in proposed fact number 66. (See Order [230] of Apr. 11, 2016, at 1 n.1.)

[3] The Floyd defendants did not file a statement of additional material facts.

statement of additional facts which she contends are material and present a genuine issue for trial.  (See Pl.'s Statement of Additional Material Facts Presenting Genuine Issues for Trial in Resp. to Def. Doctors' Mots. for Summ. J. ("P-SAMF-DD") [215].)  The defendant doctors responded to that statement of additional facts.  (See Def. Doctors' J. Resp. to Pl.'s Statement of Additional Material Facts ("DDR-P-SAMF") [243].)

As movants on their Motion, the Floyd Defendants filed a joint statement of proposed undisputed facts.  (See Statement of Material Facts in Supp. of [the Floyd Defs.'] Mot. for Summ. J. ("FDSMF") [202].)   Plaintiff submitted a response.  (See Pl.'s Resp. to [the Floyd Defs.'] Statement of Material Facts ("PR-FDSMF") [225].)  Ms. Scoggins submitted a statement of additional facts which she contends are material and present a genuine issue for trial.  (See Pl.'s Statement of Additional Material Facts Presenting Genuine Issues for Trial in Resp. to [the Floyd Defs.'] Mot. for Summ. J. ("P-SAMF-FD") [226].)   The Floyd defendants filed a response to that statement of additional facts.  (See [Floyd Defs.'] J. Resp. to Pl.'s Statement of Additional Material Facts ("FDR-P-SAMF") [249].)

Given the number of parties and the filing of cross-motions, there are 462 proposed undisputed material facts (239 by plaintiff; 56 by the defendant doctors; and 167 by the Floyd defendants).  Despite an admonition from this Court (see

Order [179] of Mar. 14, 2016), many of these proposed facts contain multiple sentences. There are also 701 responses to these proposed undisputed material facts,[4] and many of them fail to comply with the requirement of the Local Rules that they be "concise" and "nonargumentaive." See N.D. Ga. R. 56.1B.(2)a.(1). The parties have also proposed 34 additional material facts (29 by plaintiff and 5 by the defendant doctors), and there are responses thereto.

The Court has used the parties' proposals as the basis for the following statement of facts. However, given the large number of proposed facts, the often lengthy and argumentative responses thereto, and the proposed additional material facts and responses thereto, distilling the material from the immaterial has been difficult. To keep this Report and Recommendation ("R&R") from rivaling the length of a Tolstoy novel, the Court used the following conventions.

When a party admits a proposed fact (in whole or in part), the Court accepts that fact (or the part admitted) as undisputed for the purposes of this R&R, and cites only the proposed fact. When a party denies a proposed fact (in whole or in part), the Court reviews the record cited and determines whether that denial

---

[4] The defendant doctors and the Floyd defendants responded separately to the 239 proposed facts in PSMF. Either because they did not confer before filing or because they have different interests, on occasion the two sets of defendants differ on a proposed fact, i.e., one admits it while the other asserts an objection.

is supported, and if it is, whether any fact dispute is material.[5] The Court sometimes modifies a proposed fact per another party's response or per the record cited to reflect the facts more accurately. The Court also includes some facts drawn from its review of the record, see Fed. R. Civ. P. 56(c)(3), and excludes immaterial proposed facts. Given that the parties filed motions simultaneously, they sometimes proposed facts which, although not identically worded, make the same point. To avoid repetition, when the Court incorporates such a fact, it cites to one party's proposed fact and employs a "see also" signal to the other(s). The Court views all proposed facts in light of the standards for summary judgment set out Part III, infra. Finally, the Court rules on objections to proposed facts. Although the Court's preference is to explain its rulings, given the need for brevity, the Court sometimes sustains an objection for the reasons stated by the objecting party when it deems those reasons sufficient. The Court's inclusion of a proposed fact to which an objection has been asserted implicitly overrules that objection.

---

[5] The Court sometimes addresses claimed fact disputes in footnotes. However, the parties dispute many facts, and in many cases a response does not dispute the proposed fact but makes arguments about it. Thus, addressing each claimed fact dispute in detail would unduly lengthen this R&R. If the Court includes a proposed fact that a party has denied, it has implicitly ruled that the record does not support the denial. When citing a deposition transcript or document, the Court utilizes the page number assigned by the CM/ECF system, not the internal page number of the transcript or document.

A.    **The Parties**

Floyd employed Ms. Scoggins beginning April 1, 2012, as the Administrator and Chief Nursing Officer of the Polk Medical Center, Inc. ("Polk"). (PSMF ¶ 1; see also DDSMF ¶ 1; FDSMF ¶ 10.)[6] She handled all the day-to-day operations at Polk, including budgeting; supervising its directors; involvement in nursing policies and procedures; interviewing, hiring, counseling and terminating employees; implementing new policies or procedures; and serving as a liaison between Floyd and Polk. (FDSMF ¶¶ 11-13; see also PSMF ¶ 2.) However, Ms. Scoggins neither consulted with physicians regarding patient care nor gave direction to nurses regarding the same. (PSMF ¶ 4.)[7]

Floyd is the parent company of a healthcare system which includes the Floyd Medical Center, Polk, urgent care centers, and other clinical locations. (PSMF ¶ 11.) Floyd employs approximately 2,800 people. (Id. ¶ 12.)

Defendant Stuenkel serves as Floyd's President and Chief Executive Officer and as Polk's President; his responsibilities include leadership,

---

[6] Polk is a 25-bed critical access hospital located in Cedartown, Georgia. (FDSMF ¶ 1.) During 2014-15, Floyd employed between 120-140 people at Polk. (PSMF ¶ 12.) The Court excludes FDSMF ¶¶ 2-5 as immaterial.

[7] The Court sustains plaintiff's objection to FDSMF ¶ 14 for the reasons stated in PR-FDSMF ¶ 14. Any dispute over whether Ms. Scoggins occasionally engaged in patient care is immaterial; thus, the Court excludes PSMF ¶¶ 3, 5 and FDSMF ¶¶ 15-16.

management, and administration of the Floyd healthcare system.  (PSMF ¶ 10.)

Mr. Stuenkel is the ultimate authority with respect to decisions regarding Floyd's

executive team, including hiring and firing decisions.  (FDSMF ¶ 18.)   He

supervised Ms. Scoggins.  (FDSMF ¶ 17; see also DDSMF ¶ 2.)  Mr. Stuenkel is

not a physician.  (PSMF ¶ 131.)

Defendant Dr. Biuso is Floyd's Chief Medical Officer.  (PSMF ¶ 7.)  He

received a medical degree from the New York Medical College, and is board

certified in the area of internal medicine, but not psychiatry or addiction medicine.

(Id. ¶ 8.)  Dr. Biuso is a health care provider employed by Floyd who is involved

in patient care and treatment in order to ensure proper care and treatment.  (P-

SAMF-FD ¶ 8; P-SAMF-DD ¶ 8.)

Defendant Dr. Hardwell is employed by Floyd, serves as the director of the

emergency rooms at Floyd Medical Center and at Polk, and also works as an

emergency room physician.  (PSMF ¶ 13, as modified per DDR-PSMF ¶ 13 and

FDR-PSMF ¶ 13; see also P-SAMF-FD ¶ 9; P-SAMF-DD ¶ 9.)  Dr. Hardwell's

residency was in family practice, but his current position involves the practice of

emergency medicine.  (PSMF ¶ 14.)  Dr. Hardwell reports to Dr. Biuso.  (Id. ¶

16.)[8]

---

[8] The Court excludes PSMF ¶¶ 15 and 17 as immaterial.

Defendant Dr. Bouldin earned his degree in medicine in 2010, and is board certified in family medicine.  (PSMF ¶ 9.)  He has been employed by Floyd as an emergency room staff physician since July 2013, and has at all times routinely worked shifts at both Floyd Medical Center and Polk.  (DDSMF ¶ 11; see also P-SAMF-FD ¶ 10; P-SAMF-DD ¶ 10.)

The defendant doctors—Biuso, Hardwell, and Bouldin—are all licensed in the State of Georgia to practice medicine, and have been so licensed at all times relevant to this lawsuit.  (DDSMF ¶ 53.)

### B.     Floyd's Alcohol/Drug Policy

Floyd strictly prohibits the abuse of drugs and alcohol by employees.  The abuse of narcotics is a terminable offense.  Floyd's policy ([203-4] 2-8) allows for rehabilitation, in certain instances, in lieu of termination.   In such cases, successful rehabilitation is a condition of employment.  (FDSMF ¶ 6.)  Ms. Scoggins was aware of Floyd's policy against drug abuse.  (Id. ¶ 7.)  The only drugs Ms. Scoggins has taken since the beginning of her employment with Floyd were those for which she had a prescription.  (PSMF ¶ 48.)

### C.     Floyd's FMLA Policy

Under Floyd's FMLA policy, an employee may be required to obtain a certification of a health care provider to support a claim for FMLA leave within fifteen days after the beginning of the absence that the employee seeks to have

treated as FMLA leave.  (PSMF ¶ 123, as modified per objections asserted in DDR-PSMF ¶ 123 and FDR-PSMF ¶ 123.)  Employees at Floyd can give notice of leave sought under the FMLA without the physician certification form.  (PSMF ¶ 124.)  Floyd has permitted employees to take FMLA leave and submit their health care provider certifications even after fifteen days have passed.  (Id. ¶ 125.)

### D.   Confidential Medical Information

Floyd has in place a number of policies governing the protection of confidential health information.  (FDSMF ¶ 8.)  Doctors and employees receive training on these policies.  (Id. ¶ 9.)

### E.   Plaintiff's Employment Agreement

When her employment began at Floyd, Ms. Scoggins executed an Employment Agreement dated February 2, 2012, with an effective date of April 1, 2012.  (FDSMF ¶ 19.)  She agreed to be bound by the terms of the Employment Agreement.  (Id. ¶ 20.)  Section 5(e) of the Employment Agreement provides that Ms. Scoggins's employment could be terminated by Floyd "for cause" in the event of any of the following:

> (i)   Any material breach of this Employment Agreement which remains uncured fifteen (15) days after written notice of the breach is delivered to Scoggins.[9]

---

[9] Floyd never delivered a written notice of material breach of the Employment Agreement to Ms. Scoggins.  (PSMF ¶ 205.)  However, as noted by

(ii)     Conduct on Scoggins's part which amounts to fraud, gross dishonesty, gross negligence or other such willful misconduct in the performance of duties.

. . .

(iv)     Scoggins's habitual intoxication from or addiction to alcohol, narcotics or other mind altering drugs, whether legal or illicit.

. . .

(vii)    Insubordination by Scoggins, defined as the willful failure or refusal to obey instructions or directives from [Polk Medical Center, Inc.'s] President or its Board of Directors.

(FDSMF ¶ 21 & Section 5(e) of the Employment Agreement ([203-9] 5); see also PSMF ¶ 204, as modified per DDR-PSMF ¶ 204 and FDR-PSMF ¶ 204.)  As reflected above, addiction to narcotics, whether legal or illicit, was grounds for termination with cause.  (FDSMF ¶ 39.)

If Ms. Scoggins's employment was terminated with cause under the Employment Agreement, then there is no entitlement to severance pay.  If Ms. Scoggins's employment was terminated without cause under the Employment Agreement, then she is entitled to receive twelve months of salary as severance pay (reduced by any compensation received from other sources).  (FDSMF ¶ 22;

_____

the Floyd defendants, this sub-paragraph 5(e)(i) is separate from sub-paragraphs 5(e)(ii), 5(e)(iv), and 5(e)(vii), quoted infra.  (See FDR-PSMF ¶ 204.)

see also PSMF ¶¶ 202, 206, as modified per DDR-PSMF ¶ 206 and FDR-PSMF ¶ 206.)[10]

### F.    Plaintiff's Addiction

Ms. Scoggins suffers from addiction. (PSMF ¶ 32; see also FDSMF ¶ 23.) However, Ms. Scoggins testified that her drug use did not adversely affect her job performance. (FDSMF ¶ 42.) Indeed, Ms. Scoggins always received good performance reviews from Mr. Stuenkel, and was told that she did not exhibit any performance problems. (PSMF ¶ 209; see also id. ¶ 6, as modified per DDR-PSMF ¶ 6 and FDR-PSMF ¶ 6; PSMF ¶ 49.) Neither Mr. Stuenkel nor Drs. Bouldin or Hardwell ever observed Ms. Scoggins to be impaired or intoxicated at work, and no one ever told them that they saw her in that condition. (PSMF ¶¶ 50, 211.)[11] Ms. Scoggins never admitted to Mr. Stuenkel that she had abused drugs while at work. (Id. ¶ 210.) Indeed, other than when she asked doctors in the emergency room for Ambien because she depleted her supply by taking more than she should, plaintiff never told anyone at Floyd that she had an addiction

---

[10] Given the Court's recommendation on plaintiff's claim for breach of the Employment Agreement, the Court excludes FDSMF ¶ 40 as immaterial.

[11] Given the above undisputed facts, issues others may have had with plaintiff's performance, described in FDSMF ¶¶ 43-50, are excluded as immaterial. (See PR-FDSMF ¶¶ 43-50.) The Court further excludes facts plaintiff proposes about how she had a "hard time realizing" that she suffered from addiction (see PSMF ¶¶ 42-43) as immaterial.

before the events giving rise to this litigation occurred.  (FDSMF ¶ 41, as modified per PR-FDSMF ¶ 41.)

Ms. Scoggins was prescribed different opiate medications over the years, and she became addicted to them.  (PSMF ¶ 34.)  Ms. Scoggins's addiction to sleeping pills began in 2009, while her addiction to opiate medications began in 2013.  (Id. ¶ 35; see also FDSMF ¶¶ 24-26.)

The generic names "zolpidem" and "zolpidem tartrate," and the brand name "Ambien," all refer to the same drug, which is a prescription sleep aid. (DDSMF ¶ 3; see also PSMF ¶ 223.)[12]  Zolpidem is a drug to which a user can form an addiction, and to which plaintiff was addicted in March 2014.  (DDSMF ¶ 4.)

The drugs hydrocodone, oxycodone, and OxyContin are prescription opiates and narcotics used to treat pain.  (DDSMF ¶ 5.)  Hydrocodone, oxycodone, and OxyContin are drugs to which a user can form an addiction, and to which plaintiff was addicted in March 2014.  (Id. ¶ 6.)[13]  Hydrocodone is an ingredient in the drugs "Tussionex," "Norco," "Lorcet," and "Hydromet."  (Id. ¶ 7.)

_____

[12] Zolpidem is a Schedule IV controlled substance under the Federal Controlled Substances Act ("CSA").  21 U.S.C. § 801 et seq.; see also 21 C.F.R. § 1308.14(c)(54); PSMF ¶ 222.  In general, one may only obtain a controlled substance lawfully through a doctor's prescription.  See 21 U.S.C. § 829.

[13] Hydrocodone and Oxycodone are Schedule II controlled substances.  See 21 C.F.R. § 1308.12(b)(1)(vi) & (xiii).

Oxycodone is an ingredient in the drugs "Endocet," "Percocet," and "OxyContin." (Id. ¶ 8.)

Plaintiff was a patient of Physician's Assistant ("PA") Jay Pottinger, and of his wife, Dr. Jill Pottinger, at the medical practice known as MediQuick. (DDSMF ¶ 9.)  On March 7, 2014, personnel at MediQuick queried the GPDMP database, and pulled a history of all prescriptions filled in Georgia by plaintiff for a period of one year prior to that date.  A true and correct copy of this database printout was then placed in plaintiff's MediQuick patient records.  (Id. ¶ 10.)[14] (The most readable copy of the GPDMP printout retained by MediQuick is DD's Exhibit 7 ([198-6] 2-5).)  Plaintiff admits that her pharmacy records show that she had multiple prescriptions and that she had a problem with prescription medications.  (FDSMF ¶ 51, as modified per PR-FDSMF ¶ 51; FDSMF ¶ 28, as modified per PR-FDSMF ¶ 28; DDSMF ¶ 21, as modified per PR-DDSMF ¶ 21.)

Plaintiff's GPDMP records reflect that she had obtained 646 pills, or a 646-days' supply, of zolpidem tartrate (i.e., Ambien) in the preceding year, and that she had obtained over four times the recommended dosage in the preceding 30 days.  (DDSMF ¶ 22.)

---

[14] The Court excludes facts plaintiff proposes about the GPDMP statute (see PSMF ¶¶ 218-21, 224-31), because they simply quote its provisions.  (See FDR-PSMF ¶¶ 218-21, 224-31; DDR-PSMF ¶¶ 218-21, 224-31.)

Plaintiff's GPDMP records also reflect that she had obtained 440 pills, or a 126-days' supply, of drugs containing hydrocodone in the preceding year, as well as 1,303 pills, or a 326-days' supply, of drugs containing oxycodone in the preceding year.  (DDSMF ¶ 23.)  In other words, in the preceding year, Ms. Scoggins had obtained 1,743 pills, which was enough to last 452 days as prescribed.  Plaintiff acknowledges that after a doctor told her he would not write her a prescription for opiate medications, she went to another doctor because she was trying to find a way to continue taking the medication.  (PSMF ¶ 44.)

Plaintiff's GPDMP records also reflect that in the preceding year she had obtained prescriptions from thirteen doctors:  Jill Pottinger; Robert Lee Fletcher; Dewey Hammond; Steven P. Ziemer; Shereef Girgis; Dominic Shay Seymore; Frank L. Hampton; Rita S. Mezzatesta; Edward E. Meier; William Asbury; Jay M. Johnson; Robert H. Holcombe, Jr.; and George Edward Malcom, Jr.  (DDSMF ¶ 24.)[15]

Plaintiff's GPDMP records also show that in the preceding year she had filled prescriptions at eight pharmacies scattered across Northwest Georgia:

_____

[15] Three of those doctors (Girgis, Seymore, and Mezzatesta) practice together at Harbin Clinic's Spine and Pain Management Center in Rome.  (See https://harbinclinic.com/location/rome-spine-pain-center, last visited June 9, 2016.)  Dr. Fletcher is a periodontist who prescribed a limited number of hydrocodone to plaintiff following a dental procedure.  (Scoggins Dep. [186] 144; see also DD Ex. 7 [198-6], at 2.)

Avery Drugs (Rome); Armuchee Pharmacy; Wal-Mart Pharmacy No. 10-0727 (Cedartown); Rite Aid Pharmacy No. 11741 (Cedartown); Winslette Pharmacy (Rome); Scott's Pharmacy (Calhoun); Rite Aid Pharmacy No. 11755 (Rome); and Cline Pharmacy (Cave Spring).  (DDSMF ¶ 25; see also FDSMF ¶ 29, proposing same facts as DDSMF ¶¶ 22-25.)[16]  Ms. Scoggins took the drugs that she was prescribed—she did not sell or discard them.  (FDSMF ¶ 30, as modified per PR-FDSMF ¶ 30.)

### G.    Plaintiff Seeks Ambien from Defendant Bouldin

Dr. Bouldin initially met Ms. Scoggins at Polk on July 8, 2013, which was shortly after he started working for Floyd.  (FDSMF ¶ 54; see also PR-DDSMF ¶

-----------------------

[16] Plaintiff objects to facts proposed about her prescription drug use.  (See PR-DDSMF ¶¶ 22-25; PR-FDSMF ¶ 29.)  Although she asserts that the documents cited by defendants do not support the proposed facts, she does not explain how they are deficient.  The Court's review shows that the documents cited support these proposed facts.  Plaintiff also argues that the asserted facts are argumentative and irrelevant (id.), but the Court overrules that objection.  The Court excludes FDSMF ¶ 27 for the reasons stated in R-FDSMF ¶ 27.  However, it is undisputed that Dr. Girgis, who had written numerous prescriptions for plaintiff for drugs containing, inter alia, oxycodone, oxycontin, or hydrocodone, beginning March 2013, terminated the doctor-patient relationship with her on or about September 18, 2014.  (See Pl.'s Resps. and Objs. To First J. Req. for Adm. by Defs. Hardwell and Biuso to Pl., Req. Nos. 136 ([203-10] 68-69) and 352 ([203-10] 167-68).)  Ms. Scoggins testified that the doctor did so because she tested positive for hydrocodone.  (Scoggins Dep. [186] 43-44.)  The Court excludes PSMF ¶ 33 as unsupported.  (See DDR-PSMF ¶ 33; FDR-PSMF ¶ 33.)  Given the quantity of drugs consumed, plaintiff's assertion that she was "taking a little more" is an understatement.

12.)  About ten to fifteen minutes after they met, Ms. Scoggins sought to speak privately to Dr. Bouldin and asked him to write her a prescription for Ambien. (FDSMF ¶ 55; see also PSMF ¶ 36, as modified per date provided in DDR-PSMF ¶ 36 and FDR-PSMF ¶ 36; DDSMF ¶ 12.)[17]  Ms. Scoggins told Dr. Bouldin that she was out of her sleep aid, and that she had not been able to see her primary care doctor (Frank Hampton, M.D.).  (FDSMF ¶ 56.)  Ms. Scoggins did not tell Dr. Bouldin that she was taking any opiates or other medications of that kind. (PSMF ¶ 38.)  Dr. Bouldin wrote the prescription, which Ms. Scoggins filled that same day.  (DDSMF ¶ 16; see also FDSMF ¶ 57.)[18]

Plaintiff asked Dr. Bouldin for a prescription for Ambien because she knew that he was a medical doctor, licensed by the State of Georgia to write prescriptions for controlled substances, and in so asking Dr. Bouldin, relied upon his professional qualifications as a licensed medical doctor.  (DDSMF ¶ 13.)  By

---

[17] The Court sustains the objection to PSMF ¶ 37 for the reasons stated in FDR-PSMF ¶ 37.

[18] This was not the first time that plaintiff had sought medication from a Floyd physician.  She had obtained prescriptions for Ambien from Drs. Johnson, Hammond, and Ziemer.  (FDSMF ¶ 52.)  She had also obtained a prescription for hydrocodone or percoet from Dr. Johnson.  (Id. ¶ 53, as modified per PR-FDSMF ¶ 53.)

asking Dr. Bouldin for a prescription, plaintiff established a doctor-patient relationship with him.  (Id. ¶ 14; see also P-SAMF-DD ¶ 7; P-SAMF-FD ¶ 7.)[19]

### H.    Plaintiff Seeks Ambien from Defendant Bouldin a Second Time

On Thursday evening, March 6, 2014, plaintiff left Dr. Bouldin a voice mail message on his personal cell phone for the purpose of obtaining a second prescription for Ambien.  (DDSMF ¶ 17; see also FDSMF ¶ 60; PSMF ¶ 39; Bouldin Dep. [181] 91, 99-100.)  Dr. Bouldin considered the call odd because he had not given plaintiff his personal cell phone number.  (FDSMF ¶ 61.)  Dr. Bouldin did not return Ms. Scoggins's call.  (Bouldin Dep. [181] 92, 100.)

The next day (Friday, March 7) when Dr. Bouldin was working the night shift, Ms. Scoggins telephoned Polk's Emergency Room and her call was transferred to him.  (Bouldin Dep. [181] 92, 100-01.)  She asked Dr. Bouldin if he had received her voice mail message from the previous day, stated that she was out of Ambien, and asked if he could fill it again.  (Id. at 101; see also FDSMF ¶ 64.)  Dr. Bouldin became even more concerned about Ms. Scoggins's behavior because the timing of her calls indicated that she knew his schedule and when he would be on call.  (FDSMF ¶ 65.)  Dr. Bouldin told plaintiff that he had spoken to

---

[19] Given the agreement that a physician-patient relationship arose between Dr. Bouldin and Ms. Scoggins, the fact that he never opened a chart on her or that he did not deal with her like a typical patient with a substance abuse disorder is immaterial.  Thus, the Court excludes PSMF ¶¶ 23, 25, 29-31, 52, 59-60, 70-72.

Dr. Hardwell, and as a general rule, "we were not going to be filling those medicines." (Bouldin Dep. [181] 101; see also FDSMF ¶ 66; PSMF ¶¶ 40-41.)[20] Ms. Scoggins replied that it was fine, and that she did not want to get him into trouble. (FDSMF ¶ 67.)

## I.    Dr. Bouldin Checks the GPDMP Database

Following Ms. Scoggins's second request for Ambien, Dr. Bouldin became concerned that she had exhibited signs of potential substance abuse. (DDSMF ¶ 19.) Acting on that concern, Dr. Bouldin accessed the GPDMP database and

---

[20] There is an immaterial fact dispute over when Drs. Bouldin and Hardwell spoke. Dr. Bouldin testified that he had talked to Dr. Hardwell in approximately December 2013 about Dr. Hardwell's stance on writing prescriptions for Floyd employees or members of the general public who came to the emergency room. According to Dr. Bouldin, Dr. Hardwell stated that if the medication sought was not controlled or addictive, then it was appropriate to write the prescription; however, if the drug had addictive potential, then he advised against doing so. (DDSMF ¶ 18; see also FDSMF ¶ 58.) Although Dr. Hardwell's advice was not Floyd policy, it was something Dr. Bouldin took seriously. (FDSMF ¶ 59.) In contrast, Dr. Hardwell testified that he received a call from Dr. Bouldin on the evening of Thursday, March 6, 2014. (Hardwell Dep. [185] 114.) According to Dr. Hardwell, Dr. Bouldin relayed that Ms. Scoggins had asked him to write her a prescription for Ambien, and that he had previously done so. (PSMF ¶ 61.) When Dr. Bouldin asked Dr. Hardwell how he should handle this, Dr. Hardwell told him that it was "poor medicine to write a controlled substance without a full evaluation and without a chart," and that he had "never seen it be a good thing at the end." (Hardwell Dep. [185] 114-15; see also PSMF ¶ 62.) Dr. Hardwell also testified that he told Dr. Bouldin that he would "just say no." (Hardwell Dep. [185] 116.) Dr. Bouldin obviously took Dr. Hardwell's advice, whether given in December 2013 or March 2014, because he did not write a second prescription for Ms. Scoggins. Given this timeline, the Court excludes FDSMF ¶¶ 62-63.

obtained a printout of plaintiff's prescription drug history.  (Id. ¶ 20; see also PSMF ¶ 51; FDSMF ¶ 68.)[21]  After examining that history, Dr. Bouldin knew that Ms. Scoggins had what he considered drug-seeking behavior; moreover, she was either taking more pills than she was supposed to or she was selling or sharing them.  (Bouldin Dep. [181] 103-104; see also FDSMF ¶ 70.)  He determined that plaintiff was more likely than not suffering from substance abuse disorder.  (Bouldin Dep. [181] 107; see also PSMF ¶ 53; DDSMF ¶ 26; FDSMF ¶ 71.)[22]  The parties agree that Dr. Bouldin was capable of diagnosing a patient like Ms. Scoggins as suffering from substance abuse disorder.  (PSMF ¶ 24.)  Dr. Bouldin felt a moral and ethical obligation to help Ms. Scoggins.  (FDSMF ¶¶ 73-74.)

---

[21] The printout Dr. Bouldin examined was similar to the one obtained by MediQuick, discussed supra Part I.F.  (DDSMF ¶ 20.)  Dr. Bouldin accessed the GPDMP database at about 2:00 or 3:00 a.m. on Saturday morning (March 8, 2014).  (Bouldin Dep. [181] 103.)  The Court sustains the objection to FDSMF ¶ 69 for the reasons stated in PR-FDSMF ¶ 69.  Because Dr. Bouldin, as plaintiff's physician, had a right to access the GPDMP database and examine her prescription history, PSMF ¶ 64, which states that Drs. Hardwell and Bouldin did not discuss whether Ms. Scoggins had given Dr. Bouldin permission to do so, is excluded as immaterial.  Plaintiff testified that the act of requesting a prescription from a doctor constitutes consent for that doctor to access the GPDMP.  (DDSMF ¶ 15, as modified per record cited.)

[22] Dr. Bouldin testified that the recommended dosage for Ambien is one pill per day.  However, the GPDMP printout showed that Ms. Scoggins had obtained 120 tablets, or four times the recommended dosage, in less than 30 days, and she was calling him and asking for more; thus, he knew that there was a "big problem there."  (Bouldin Dep. [181] 110.)

### J.    Dr. Bouldin Meets with Dr. Hardwell about Ms. Scoggins

Dr. Bouldin testified that after he got off work at 6:00 a.m. on Saturday, March 8, 2014, he drove over to Floyd Hospital with the GPDMP printout to meet with Dr. Hardwell.  (Bouldin Dep. [181] 108; see also PSMF ¶ 63[23]; FDSMF ¶ 72.)   Dr. Bouldin wanted to speak with Dr. Hardwell about Ms. Scoggins and her patient care because "it was a very sensitive matter" given "who Kim was from Floyd's organizational standpoint."  (PSMF ¶ 69.)  Also, he knew that Dr. Hardwell had dealt with similar situations in the past and could help figure out how best to handle this.  (FDSMF ¶ 75.)

He found Dr. Hardwell in the emergency room and said, "I need to speak with you on – about a patient.  I said, I've got a – I think I have a big problem, and I'm not quite sure of the direction to go about taking care of it."  (Bouldin Dep. [181] 109.)  The parties dispute whether Dr. Bouldin was seeking a consult with Dr. Hardwell in this meeting.  (Compare PSMF ¶ 66, with DDR-PSMF ¶ 66.)[24]  In any event, they went to a nearby room and Dr. Bouldin told Dr. Hardwell about his interaction with Ms. Scoggins, and Dr. Hardwell looked at the

---

[23] The defendants admit the above fact and dispute only the day of the week, asserting that Drs. Bouldin and Hardwell met no later than Friday, not Saturday.  (See DDR-PSMF ¶ 63; FDR-PSMF ¶ 63.)  As the Floyd defendants acknowledge, this is not a material fact dispute.

[24] The Court excludes PSMF ¶ 68 as immaterial.

GPDMP printout.  (Bouldin Dep. [181] 109-110; see also DDSMF ¶ 27; P-SAMF-DD ¶ 6; P-SAMF-FD ¶ 6.)  Dr. Hardwell told Dr. Bouldin:  "I agree that she's got a problem, and we've got to get her some help."  (Hardwell Dep. [185] 119; see also DDSMF ¶ 28; FDSMF ¶ 77.)  Dr. Bouldin left the GPDMP printout with Dr. Hardwell, who said he would take care of the issue that day.  (Hardwell Dep. [185] 119.)  Dr. Hardwell's only assessment or evaluation of Ms. Scoggins was his review of the printout of her prescription drug history from the GPDMP database and what Dr. Bouldin told him.  (PSMF ¶ 74.)

Dr. Bouldin had no further involvement relevant to this case.  (DDSMF ¶ 29, as modified per PR-DDSMF ¶ 29.)  However, plaintiff contends that she never expressed her consent to any release of her prescription drug history. (PSMF ¶ 143.)[25]

---

[25] Given the Court's recommended resolution infra of plaintiff's state law claims against Dr. Hardwell, Dr. Biuso, and Mr. Stuenkel, the Court excludes as immaterial PSMF ¶¶ 26-28, 58, 65, 67, 73, 75-84, 87-90, 92-93, 94-99, 103-04, 106-08, 140-42, 185; DD-SAMF ¶¶ 1-5; DDSMF ¶¶ 47-52, 54-55; FDSMF ¶ 76, 83, 115, 145; P-SAMF-FD ¶¶ 5, 11; and P-SAMF-DD ¶¶ 5, 11.  Given the Court's recommended resolution infra of plaintiff's ADA claims against Floyd, the Court excludes as immaterial PSMF ¶¶ 133 and 187.  The Court also excludes P-SAMF-FD ¶¶ 1-2 and P-SAMF-DD ¶¶ 1-2, which incorporate by reference both the original [193] and corrected substitute [214-1] of PSMF, as inappropriate under the Local Rules.

### K.    Dr. Hardwell Goes to Dr. Biuso About Ms. Scoggins

On March 7 or 8, 2014, Dr. Hardwell went to Dr. Biuso and told him that Ms. Scoggins had asked for medications from multiple doctors in the emergency room, that Dr. Bouldin had come to him with his concerns about her, that Dr. Bouldin had obtained a printout of her prescription drug history from the GPDMP database, that he had that printout with him, and that they needed to get Ms. Scoggins some help.  (DDSMF ¶ 30, as modified per record cited; see also PSMF ¶ 85.)[26]  During that conversation, Dr. Hardwell showed Dr. Biuso the GPDMP printout.  (PSMF ¶ 86.)  Dr. Biuso reviewed the printout and agreed with Dr. Hardwell's conclusion that Ms. Scoggins was exhibiting drug-seeking behavior and had a problem with prescription medications.  (DDSMF ¶ 31.)  Dr. Biuso testified, "[I]t was obvious to any clinician that there was a serious addiction problem here."  (Biuso Dep. [180] 111; see also PSMF ¶ 91, stating that at the

_____

[26] Dr. Hardwell went to Dr. Biuso because, in the past, persons holding the position of Floyd's Chief Medical Officer had assisted him in dealing with similar situations.  (Hardwell Dep. [185] 122-23; see also note 57, infra.)  He believed Dr. Biuso had the contacts necessary to get plaintiff into a program with an addiction specialist.  (FDSMF ¶ 81.)  Dr. Hardwell also went to Dr. Biuso because this was an unusual situation involving a high-level administrator that needed to be handled properly.  (Hardwell Dep. [185] 127-28, citied in PR-DDSMF ¶ 30.)  The Court sustains the objections to FDSMF ¶ 82 for the reasons stated in PR-FDSMF ¶ 82.  That proposed fact is also immaterial.

time Ms. Scoggins asked for prescription medications, she suffered from the medical condition of addiction.)[27]

### L.   Dr. Biuso Goes to Monk and Stuenkel About Ms. Scoggins

After learning about Ms. Scoggins's problem from Dr. Hardwell, Dr. Biuso contacted Floyd's then-General Counsel, Wade Monk, who advised him to go see Mr. Stuenkel, and stated that the three of them would then get together on the telephone and talk about a plan to get help for Ms. Scoggins. (Biuso Dep. [180] 124.)

Dr. Biuso then went to see Mr. Stuenkel. (FDSMF ¶ 84.)[28] Dr. Biuso explained to Mr. Stuenkel what had transpired regarding Ms. Scoggins, including: her interaction with Dr. Bouldin; Dr. Bouldin's alarm at her request for a prescription; his access of the GPDMP database; Dr. Bouldin's opinion that the database showed Ms. Scoggins's was possibly addicted; Dr. Bouldin's consultation with Dr. Hardwell; Dr. Hardwell's review of the GPDMP printout; Dr. Hardwell's consultation with Dr. Biuso; and that in the judgment of all three doctors (Bouldin, Hardwell, and Biuso), Ms. Scoggins had an addiction problem. (FDSMF ¶ 86, as modified per record cited; see also DDSMF ¶ 33, as modified

---

[27] The Court excludes DDSMF ¶¶ 32 and 37-38 because they constitute legal conclusions. See N.D. Ga. R. 56.1B.(1)(c).

[28] The Court excludes FDSMF ¶ 85 as immaterial.

25

per record cited.)  Without Ms. Scoggins's consent, Dr. Biuso told Mr. Stuenkel that there was a pattern of narcotic drug abuse reflected in the printout of her prescription drug history from the GPDMP database.  (PSMF ¶ 101.)[29]

Dr. Biuso and Mr. Stuenkel then telephoned Mr. Monk.  (FDSMF ¶ 87.)[30] Arising out of this conversation, Dr. Biuso and Mr. Stuenkel devised a treatment plan for Ms. Scoggins.  Under this plan, they would meet with Ms. Scoggins, and if she admitted that she had an addiction problem and would cooperate to seek help for her condition, then Floyd would send her to Ridgeview for treatment.  (Id. ¶ 88, as modified per PR-FDSMF ¶ 88; see also DDSMF ¶ 34; PSMF ¶ 105, as modified per FDR-PSMF ¶ 105 and DDR-PSMF ¶ 105.)[31]  As discussed below, they elected to use Dr. Hardwell to set up this meeting.

──────────────

[29] Plaintiff contends that neither Dr. Biuso, Dr. Hardwell, nor Dr. Bouldin asked for her consent to share her prescription drug history with anyone.  (P-SAMF-DD ¶ 3; P-SAMF-FD ¶ 3.)  The defendant doctors respond that consent is unnecessary when a physician consults with a colleague about a patient's treatment.  (DDR-P-SAMF ¶ 3.)

[30] The Court excludes PSMF ¶¶ 100 and 102 for the reasons stated in DDR-PSMF ¶¶ 100 and 102 and in FDR-PSMF ¶¶ 100 and 102.  In any event, even if non-privileged, these proposed facts are cumulative.

[31] Plaintiff disputes DDSMF ¶ 34 with argument and record citations about how the plan was executed, not about the substance of the plan.  The Court excludes DDSMF ¶ 35 because its contents are included infra.

### M.    Dr. Hardwell Meets with Ms. Scoggins

Dr. Biuso called Dr. Hardwell and told him that they needed to get Ms. Scoggins some help.  He asked Dr. Hardwell to meet with her, encourage her to come talk with them, and that they would have something arranged.  (FDSMF ¶ 89.)  As requested, Dr. Hardwell met with Mrs. Scoggins on Friday, March 14, 2014, asked her if she had sought Ambien from any of Floyd's doctors, and she admitted that she had.   According to plaintiff, Dr. Hardwell then responded, "We've got to go see Dr. Biuso and [Mr. Stuenkel], and I need to take you over there."   (PSMF ¶ 109, modified per record cited.)   Dr. Hardwell recalls he told Ms. Scoggins that Dr. Bouldin had concerns about her health, that the records Dr. Bouldin pulled showed she had an addiction problem, that they needed to go meet with administration, and that administration was going to get her some help.  (FDSMF ¶¶ 90-91, as modified per record cited.)

During her interaction with Dr. Hardwell, Ms. Scoggins became apologetic, tearful, and very upset.  (FDSMF ¶ 92.)  Dr. Hardwell recalls plaintiff stating that she was willing to talk to Dr. Biuso to get some help.  (Id. ¶ 93.)[32]  Dr. Hardwell

---

[32] Although plaintiff disputes the above fact (see PR-FDSMF ¶ 93), Dr. Hardwell so testified.  Plaintiff was not asked in her deposition whether she made the above statement.  (Scoggins Dep. [186] 105-06.)

and Ms. Scoggins then walked over to the administrative boardroom together.  (Id. ¶ 94; see also PSMF ¶ 110.)

### N.    The Boardroom Meeting on March 14, 2014

Once at the administration building, Ms. Scoggins and Dr. Hardwell met with Dr. Biuso in the boardroom.  (FDSMF ¶ 95.)  Dr. Hardwell waited for a minute and then left.  (Id. ¶ 96.)  Dr. Hardwell had no further involvement related to this case.  (DDSMF ¶ 36.)

There is a dispute over whether plaintiff's GPDMP printout was in the boardroom.  Plaintiff recalls that Dr. Hardwell gave Dr. Biuso a folder containing that printout.  (See PR-FDSMF ¶ 96; see also PSMF ¶ 111.)  Defendants deny that the Dr. Hardwell did so.  (FDR-PSMF ¶ 111; DDR-PSMF ¶ 111; see also FDSMF ¶¶ 111-12.)  Ms. Scoggins testified that Dr. Biuso had the printout in front of him during the meeting and was referring to it, naming drugs prescribed to her and the doctors who wrote them.  (PSMF ¶ 113.)  She sat about four feet from the printout and could see small print arranged in columns.  (Id. ¶ 114.)  Defendants assert that the printout was not in the room.  (FDR-PSMF ¶¶ 113-14; DDR-PSMF ¶¶ 113-14.)[33]

––––––––––––––––––––––

[33] There is no evidence in the record indicating that plaintiff's GPDMP record was disseminated, published, or otherwise communicated to anyone other than Drs. Bouldin, Hardwell, Pottinger, and Biuso.  With regard to Mr. Stuenkel, he had no knowledge of the contents of plaintiff's GPDMP record, but he was

After Dr. Hardwell left, Dr. Biuso went to get Mr. Stuenkel, who then joined Dr. Biuso and Ms. Scoggins in the boardroom.  (PSMF ¶ 112.)  The Floyd defendants assert that Ms. Scoggins expressly consented to Mr. Stuenkel joining the conversation to determine how best to move forward, and that such consent was provided by plaintiff before Mr. Stuenkel was called to join them.  (FDSMF ¶ 98.)  However, Ms. Scoggins denies that she gave any such consent.  (PR-FDSMF ¶ 98.)

According to Ms. Scoggins, Dr. Biuso began the meeting by accusing her of having a serious drug problem, telling her about his son's drug problem, and stating that she had no choice but to go to treatment.  (PSMF ¶ 115.)[34]  Ms. Scoggins was emotional in the meeting, admitted that she had a problem with drugs, and stated that she would take, for example, seven or eight Ambien in a

───────────────

told that it indicated she had a substance abuse problem.  (DDSMF ¶ 45 & n.3.) The assertions plaintiff makes in an effort to dispute that fact (see PR-DDSMF ¶ 45) fail to do so.  She has conflated conversations that Mr. Stuenkel had with several groups or organizations.  (See infra note 55.)  The Court excludes facts over what may have happened to the GPDMP printout (see PSMF ¶¶ 214, 233-36; DDSMF ¶ 56), because the Second Amended Complaint only alleges unlawful disclosure, not improper disposal, of that printout.  (See FDR-PSMF ¶¶ 214, 233-36; DDR-PSMF ¶¶ 214, 233-36.)

[34] Although defendants dispute this proposed fact (see DDR-PSMF ¶ 115; FDR-PSMF ¶ 115), it is supported by plaintiff's testimony.

twenty-four hour period.  (FDSMF ¶ 97[35]; see also FDSMF ¶ 99, as modified per

PR-FDSMF ¶ 99, and PSMF ¶ 116, where plaintiff states she was distraught and

hysterical in this meeting and admitted to drug dependency.)[36]  Ms. Scoggins

admitted to Dr. Biuso and Mr. Stuenkel that she had a problem and would

undergo treatment.  (PSMF ¶¶ 47, 118.)  Ms. Scoggins asked Dr. Biuso and Mr.

Stuenkel if she had done anything wrong or had any job performance issues, and

they said that she had not done anything wrong, but that she obviously had a

problem and referred to the list of prescription drugs.  (Id. ¶ 117, as modified per

record cited.)

At the end of the boardroom meeting, Ms. Scoggins was told that she

needed to go directly to Ridgeview that day, and that she could not go get her

belongings by herself.  (PSMF ¶ 136.)  Mr. Stuenkel told her that it was a

requirement of her employment that she go to Ridgeview for its inpatient drug

treatment program, and that if she did not, then her employment would be

terminated.  (Id. ¶¶ 138, 176; see also FDSMF ¶ 102, as modified per PR-FDSMF

---

[35] Although Dr. Biuso testified that Ms. Scoggins admitted to taking seven or eight Ambien per day, she disputes that testimony by asserting that she was taking at most 2.5 Ambien per day at that time.  (PR-FDSMF ¶ 97.)  This is not a material dispute given plaintiff's admissions that she was taking more Ambien than she should (FDSMF ¶ 35, as modified per PR-FDSMF ¶ 35) and not taking them as prescribed.  (FDSMF ¶ 36.)

[36] The Court sustains plaintiff's objections to FDSMF ¶¶ 100 and 104 for the reasons stated in PR-FDSMF ¶¶ 100 and 104.

¶ 102.)[37]   Ms. Scoggins got upset and stated that she wanted to enter the Floyd Behavioral Health outpatient program instead of Ridgeview.  (PSMF ¶¶ 128, 178.) [38]   However, Ms. Stuenkel gave her no choice concerning treatment programs.  (Id. ¶ 139.)   He told Ms. Scoggins that she was required to get treatment and accept the plan devised for her in order to keep her job.  (Id. ¶ 177.)   Ms. Scoggins asked to delay her admission to Ridgeview due to a family event, but Mr. Stuenkel and Dr. Biuso insisted that she go immediately.  (FDSMF ¶ 101; see also PSMF ¶¶ 119, 127.)

––––––––––––––––––––––

[37] Mr. Stuenkel testified that the condition of employment he imposed on Ms. Scoggins was that she go to the Ridgeview program, get assessed, and that they would work out what would occur next; there would not be an interminable stay in an inpatient treatment program.  (Stuenkel Dep. [188] 250-51.)  In other words, the Ridgeview program began with an inpatient stay.  (Id. at 98.)  Moreover, Mr. Stuenkel did not give Ms. Scoggins a specific time frame for how long she had to remain at Ridgeview; that would be left up to her in consultation with the doctors there.  (Id. at 180.)

[38] Mr. Stuenkel testified that Ms. Scoggins may have suggested in this meeting that she be allowed to undergo outpatient treatment at Floyd Behavioral Health instead of Ridgeview.  (FDSMF ¶ 113, sentence 1; see also PSMF ¶ 129.)  Given that fact, the Court excludes PSMF ¶ 134 for the reasons stated in FDR-PSMF ¶ 134.  However, Mr. Stuenkel rejected the option of Floyd Behavioral Health.  (PSMF ¶ 130.)  Because he was concerned that individuals in Rome might learn that Ms. Scoggins was undergoing treatment, Mr. Stuenkel decided that the Ridgeview program was in her best interest for privacy and success.  (FDSMF ¶ 113, sentence 2; see also PSMF ¶ 132.)  Mr. Stuenkel also testified that, even if Ms. Scoggins had suggested Floyd Behavioral Heath, she agreed to go to Ridgeview as a condition of employment.  (FDSMF ¶ 114.)  However, plaintiff claims that she did not agree to the longer outpatient residential treatment at Ridgeview and believes that she did not need inpatient treatment at all.  (PR-FDSMF ¶ 114.)

Floyd contends that Ms. Scoggins agreed to go to Ridgeview as a condition of her employment, and that she expressed no desire to pursue any alternative. (FDSMF ¶ 103, as modified per record cited; FDSMF ¶ 110.)  Although Ms. Scoggins responds that she agreed to go to Ridgeview the day of the boardroom meeting, she contends that she did not agree to participate in its longer outpatient residential program (discussed infra) and asserts that she never needed inpatient treatment.  (PR-DSMF ¶¶ 103, 110; see also PSMF ¶ 153.)

Floyd further contends that Ms. Scoggins agreed in that meeting to sign a release (sometimes called a "consent") so that Dr. Biuso and Mr. Stuenkel could monitor her progress, and that her signing a release was part and parcel of her agreement to complete treatment at Ridgeview.  (FDSMF ¶¶ 106-07; see also PSMF ¶ 137; PR-FDSMF ¶ 107, asserting that from Floyd's view, it was a condition of continued employment for plaintiff to sign that release.)  Ms. Scoggins responds that she was never asked, and never agreed, to sign a release authorizing disclosure of information to Floyd personnel, either in the boardroom or at any other time.  (PR-DSMF ¶ 106.)[39]

---

[39] Plaintiff turned this response into an additional disputed material fact (see P-SAMF-DD ¶ 4; P-SAMF-FD ¶ 4), which the defendant doctors admitted (see DDR-P-SAMF ¶ 4), but to which the Floyd defendants objected (see FDR-P-SAMF ¶ 4).  However, the defendant doctors had earlier taken the opposite position.  (See DDSMF ¶ 40, asserting that plaintiff never signed the release even

According to Floyd, the purpose of that release was to facilitate a conversation with Ms. Scoggins and the Ridgeview Program Director while Floyd was sponsoring her treatment so that Floyd could determine how she was going to integrate back into the organization after treatment.  (FDSMF ¶ 108.)  Although plaintiff disputes that statement, she directs the Court to testimony by Mr. Stuenkel which makes the same point, i.e., that he wanted the release in order to obtain information about her treatment from Dr. Steven Lynn at Ridgeview so he could determine what the next steps in Floyd's relationship with Ms. Scoggins might be.  (PR-FDSMF ¶ 108.)  Thus, FDSMF ¶ 108 is undisputed.

Floyd adds that, through the release, it was not seeking access to plaintiff's medical records, the individual entries therein, or the prescription treatment.  (FDSMF ¶ 109.)  Instead, Floyd sought plaintiff's signature on that release to be able to communicate with Ridgeview personnel to determine what the next steps would be in its relationship with Ms. Scoggins by learning about the length of the inpatient program, what the outpatient program might look like, and what the

_____

though she told Dr. Biuso and Mr. Stuenkel in the boardroom that she would do so.)

33

timeline for these programs might be.  (Stuenkel Dep. [188] 136, cited in PR-FDSMF ¶ 109.)[40]

During the boardroom meeting, Ms. Scoggins said that she was worried about her job and about being fired, and that she wanted to return to work after treatment.  (PSMF ¶ 126.)  Ms. Scoggins contends that Mr. Stuenkel replied that she had six months of sick time, that she could go out on FMLA, and that she could return to work after she took leave to take treatment for her substance abuse disorder.  (Id. ¶¶ 120-21; see also FDSMF ¶ 105, summarizing Dr. Biuso's testimony that Mr. Stuenkel told plaintiff she could return to work after she took leave for treatment for substance abuse.)[41]  Mr. Stuenkel denies that he told plaintiff that she had six months of sick time and that she could go out on FMLA.  (FDR-PSMF ¶¶ 120-21.)   Ms. Scoggins never received any FMLA-related paperwork.  (PSMF ¶ 135.)

### O.    Ms. Scoggins Goes to Ridgeview

After the meeting in the boardroom, plaintiff went that day and enrolled in substance abuse treatment at Ridgeview (i.e., Friday, March 14, 2014).  (DDSMF ¶ 39.)  While there, she learned that the program had two components:  inpatient

---

[40] Plaintiff does not deny FDSMF ¶ 109, but objects on the grounds that it is immaterial.  (See PR-FDSMF ¶ 109.)  The Court overrules plaintiff's objection and accepts the facts stated in FDSMF ¶ 109 as undisputed.

[41] The Court excludes PSMF ¶ 122 because it states a legal conclusion.

treatment, which lasted anywhere from three to seven days, followed by an outpatient residential program, which could last up to eight weeks, during which she would be required to stay overnight in apartments on the Ridgeview campus. (FDSMF ¶ 119, as modified per record cited.)

Plaintiff described her first day of treatment (Saturday, March 15) at Ridgeview as one of the worst days of her life.  (Scoggins Dep. [186] 152.)  She almost left that day, thinking she was going to be fired anyway.  (FDSMF ¶ 121.) However, she decided, "I'm going to do this."  (Scoggins Dep. [186] 152.)  As she underwent treatment, Ms. Scoggins learned from Chip Abernathy and other Ridgeview personnel that she would be discharged from the inpatient program and moved to the outpatient residential program located on the same campus. (PSMF ¶ 146.)

Mr. Abernathy and plaintiff's treating physician, Dr. Lynn, told Ms. Scoggins that they wanted her to participate in Ridgeview's residential outpatient treatment program.  When Ms. Scoggins asked Dr. Lynn if there were other outpatient treatment options, he replied in the affirmative and provided her with a list of such programs.  (PSMF ¶¶ 149-50.)  Ms. Scoggins did not want to leave Ridgeview against medical advice, and wanted to participate in an outpatient treatment program, but Dr. Lynn said that she had to stay a minimum of two weeks in residential outpatient treatment if she remained at Ridgeview.  (Id. ¶

35

148.)[42]  Dr. Lynn also asked Ms. Scoggins if she would sign a consent form to allow him to talk to Dr. Biuso, but Ms. Scoggins refused.  (Id. ¶ 162.)

Ms. Scoggins left Ridgeview on Monday, March 17, 2014.  (PSMF ¶ 144.) She arrived home about 5:00 p.m. that day, unpacked her bags, and spent time with her family.  (Id. ¶ 155; see also Scoggins Dep. [186] 164.)  In sum, Ms. Scoggins was in Ridgeview's inpatient program for less than three days, and did not enroll in its outpatient residential program.  (FDSMF ¶ 120.)  Ms. Scoggins asserts that she completed Ridgeview's inpatient treatment program (Scoggins Dep. [186] 76), and contends that she did not request a discharge, but rather had been told by all the doctors at Ridgeview that she would go home after four days. (PSMF ¶ 145.)

There is an immaterial dispute over some entries on Ms. Scoggins's Discharge Summary from Ridgeview.  This dispute is not material because Mr. Stuenkel did not know about this document when he fired Ms. Scoggins.  (PSMF ¶ 179; see also Stuenkel Dep. [188] 98.)   However, the Court includes the Discharge Summary because it helps establish the chronology.

-------------------

[42] Ms. Scoggins wanted to go the Floyd Behavioral Health outpatient program because her insurance covered more of its costs; moreover, it was in Rome while Ridgeview was in Atlanta.  (PSMF ¶ 147.)  She received this list from Ridgeview as she left on Monday, March 17.  (Scoggins Dep. [186] 171-72.)  Mr. Stuenkel did not know that plaintiff had received this list.  (PSMF ¶ 180.)

That Discharge Summary states in relevant part as follows:

> The patient was admitted to Ridgeview Recovering Professionals Addiction Program [on 03/14/14] under the services of Dr. Steven Lynn. . . . She requested ~~AMA~~ discharge. . . . She refused the Ridgeview Recovering Professionals Program and insisted on an outpatient referral. . . . On 3/17, the patient was discharged. ~~AMA~~. . . .
>
> PROGNOSIS:  Guarded secondary to the patient being discharged ~~against medical advice~~.

(FD Ex. T [203-19], at 3-4.)

AMA stands for "against medical advice."  Someone at Ridgeview struck through two AMA designations in the above-quoted excerpt.  The words "against medical advice" in the prognosis section were also struck through by hand and the word "administratively" inserted in their place.  The date of the change was listed as December 2, 2014.  After the change, the prognosis reads:  "Guarded secondary to the patient being discharged administratively."  (FD Ex. T [203-19], at 4.)  Given the similarities between Dr. Lynn's signature above his signature line and the initials following that handwritten strike through, it appears that Dr. Lynn changed the discharge from AMA to administrative.

Defendants assert that plaintiff was discharged from Ridgeview against medical advice, and that after the litigation began in November 2014, she called Dr. Lynn and asked him to remove the AMA designation from the Discharge Summary.  (FDSMF ¶¶ 122-24.)  Ms. Scoggins responds that she received an

administrative discharge before she left Ridgeview, and that she never requested to be discharged from Ridgeview's inpatient treatment program, but only requested to go to an outpatient program that did not involve staying overnight. (PSMF ¶¶ 151-52; see also PR-FDSMF ¶ 122.)[43]  She adds that she does not know when she requested removal of the AMA designation, but she requested at the time she left Ridgeview not to be discharged AMA because she was going to outpatient treatment.  (PR-FDSMF ¶ 123.)

Ms. Scoggins testified that it was her understanding that Mr. Stuenkel wanted her to stay at Ridgeview for its outpatient residential program.  (Scoggins Dep. [186] 139.)  However, as noted above, she did not want to do so.  Thus, when she left Ridgeview, Ms. Scoggins did not inform Mr. Stuenkel or Dr. Biuso that she had done so.  (FDSMF ¶ 125.)

### P.    Plaintiff's Activities After Leaving Ridgeview

On her first full day at home (Tuesday, March 18, 2014), plaintiff conducted research on the internet into outpatient treatment options and telephoned some of them.  (PSMF ¶ 156.)  On Wednesday, she made an appointment for the upcoming Friday at Floyd Behavioral Health, and then went

---

[43] The Court excludes PSMF ¶ 154 for the reasons stated in FDR-PSMF ¶ 154.

to the lake to relax.  (Scoggins Dep. [186] 163, 165; <u>see also</u> FDSMF ¶ 126.)[44]

She returned home from the lake on Thursday.  (Scoggins Dep. [186] 165-66.)

She did not telephone Mr. Stuenkel on Tuesday, Wednesday, or Thursday,

because she knew that he would be upset that she had left Ridgeview.  (<u>Id.</u> at 166;

<u>see also</u> FDSMF ¶¶ 127-28.)

On Friday, March 21, 2014, Ms. Scoggins went to Floyd Behavioral Health

seeking admission to its outpatient addiction treatment program.  (PSMF ¶ 157.)[45]

After the assessment was completed, she received the treatment schedule, which

was 8:00 a.m. to 2:00 p.m., Monday through Thursday, with fewer hours on

Friday, and which was set to begin on Monday, March 24.  (<u>Id.</u> ¶ 159; <u>see also</u>

Scoggins Dep. [186] 171.)  Upon Dr. Meyer's review of the assessment, she

determined that plaintiff should undergo intensive outpatient treatment.  (P-

SAMF-FD ¶¶ 17-18.)

---

[44] Floyd Behavioral Health is a clinic within the Floyd healthcare system which provides outpatient drug addiction treatment.  (PSMF ¶ 18.)  Patients suffering from alcoholism or substance abuse may receive individual psychotherapy sessions there as well as intensive outpatient treatment.  (<u>Id.</u> ¶ 19.) This clinic employs Dr. Nadia Meyer, who holds board certifications in psychiatry and addiction medicine.  (<u>Id.</u> ¶ 20.)

[45] Plaintiff's first visit to Floyd Behavioral Health on Friday was for assessment only.  (Scoggins Dep. [186] 167-68; <u>see also</u> Second Scoggins Decl. [226-1], at 5-10 (Attach. 1).)

## Q.    Dr. Biuso Contacts Ridgeview and Mr. Stuenkel's Memorandum

Meanwhile, about a day or so after Ms. Scoggins went to Ridgeview, Dr. Biuso telephoned Ridgeview and asked about her; he was told that she had not signed a consent to release her medical information.  (PSMF ¶ 163; see also FDSMF ¶¶ 130-31.)

On Monday, March 17, 2014, Matthew Gorman[46] drafted a memorandum for Mr. Stuenkel directed to Floyd's Executive Leadership Team which explained that Ms. Scoggins "has taken a medical leave of absence from her position as administrator and chief nursing officer of Floyd Polk Medical Center," and that everyone was "wishing her a full and prompt recovery."  (PSMF ¶ 237; see also id. ¶¶ 161, 232.)  More than fifty people received the memorandum.  (PSMF ¶ 238; see also FDSMF ¶ 117.)

Approximately four days after Ms. Scoggins went to Ridgeview (or on Tuesday, March 18), Dr. Biuso telephoned Ridgeview a second time, and was told that Ms. Scoggins could sign a release if she were there, which Dr. Biusco took to mean that she had left.  (PSMF ¶ 164; see also DDSMF ¶ 41; FDSMF ¶¶ 132-33.)

---

[46] Mr. Gorman served as the Senior Projects Manager for Floyd from around 2012 or 2013 until he became the Administrator at Polk after Ms. Scoggins's termination.  (PSMF ¶ 22.)

**R.    Mr. Stuenkel Terminates Ms. Scoggins's Employment**

On or about Friday, March 21, 2014, Dr. Biuso told Mr. Stuenkel that someone at Ridgeview said Ms. Scoggins was no longer there. (PSMF ¶ 165; see also DDSMF ¶ 42; FDSMF ¶ 134.) Upon hearing that Ms. Scoggins was no longer at Ridgeview, Mr. Stuenkel was upset, wanted to know where she was, and wanted to talk to her. (PSMF ¶ 166.) Mr. Stuenkel was upset because Ms. Scoggins had left treatment and treatment was a condition of her employment. (Id. ¶ 167; see also FDSMF ¶ 135.) Mr. Stuenkel also wanted updates about Ms. Scoggins's treatment so the next steps in Floyd's relationship with her could be determined, but that was not possible because Ms. Scoggins would not allow Mr. Stuenkel and Dr. Biuso to converse with Ridgeview personnel. (PSMF ¶ 168.)

After Dr. Biuso told Mr. Stuenkel that Ms. Scoggins was no longer at Ridgeview and had not signed a release of her medical information to them, Mr. Stuenkel called Ms. Scoggins on March 21, 2014, and left a voicemail message in which he said, among other things, "We have been in contact with the program inquiring about the consent that you needed to sign. I understand you have not signed the consent, and we also understand you're no longer a patient. So we need to talk about what happens next." (PSMF ¶ 169; see also DDSMF ¶ 43; FDSMF ¶¶ 136-37.) When Mr. Stuenkel left the message for Ms. Scoggins, he did not yet know that he would terminate her employment. (PSMF ¶ 171.) In

other words, he made the decision to terminate her employment during the telephone call which is discussed below. (FDSMF ¶ 143.)

About two hours after Mr. Stuenkel left that message, Ms. Scoggins returned his call; Mr. Stuenkel went into Dr. Biuso's office to take the call; and Mr. Stuenkel told Ms. Scoggins that by leaving the Ridgeview program, she had disobeyed his directive. (PSMF ¶ 170; see also DDSMF ¶ 43; FDSMF ¶¶ 138-39.) Mr. Stuenkel also told Ms. Scoggins that she did not provide authorization for him to talk to her medical providers. (PSMF ¶ 172.) He reiterated that their agreement and the condition of her employment was that she complete the inpatient program at Ridgeview. (FDSMF ¶ 141.)

After Ms. Scoggins told Mr. Stuenkel that she was no longer at Ridgeview, that she did not need to be, and that she was enrolled in the Floyd Behavioral Health outpatient program, Mr. Stuenkel told her that he had lost trust in her and fired her. (PSMF ¶¶ 173-74, 181-82; see also DDSMF ¶ 43; FDSMF ¶¶ 129, 140, 142.) Mr. Stuenkel did not decide to fire Ms. Scoggins until she told him that she was no longer at Ridgeview and had applied to the outpatient treatment program at Floyd Behavioral Health. (PSMF ¶ 183.) The decision to terminate Ms.

42

Scoggins was made solely by Mr. Stuenkel.  (DDSMF ¶ 44; <u>see also</u> PSMF ¶¶ 184, 188.)[47]

Mr. Stuenkel terminated Ms. Scoggins's employment in part because it was unacceptable to him that she had left Ridgeview, and "she didn't follow through on the agreed-upon plan that she agreed to" of going to treatment there.  (PSMF ¶ 189, as modified per FDR-PSMF ¶ 189; <u>see also</u> PSMF ¶ 175.)  His other reasons included the fact that she was absent for several days without informing him where she was.  (Stuenkel Dep. [188] 72; <u>see also</u> PSMF ¶ 217, as modified per record cited, to reflect Mr. Stuenkel's testimony that plaintiff's insubordination began by not communicating with Floyd while at Ridgeview, and then continued with several days of absence with no communication.)  Mr. Stuenkel believed that these actions constituted insubordination and grounds for termination under the Employment Agreement.  (FDSMF ¶ 144.)[48]

---

[47] The Court excludes FDSMF ¶¶ 148-50 as immaterial and/or asserting legal conclusions.

[48] Although plaintiff disputes FDSMF ¶ 144, she does so by arguing that Floyd violated the ADA and the FMLA; she does not dispute the facts proposed. (PR-FDSMF ¶ 144.)   Given that Floyd does not appear to argue that Ms. Scoggins was terminated for fraud, gross dishonesty, gross negligence, or willful misconduct under the Section 5(e)(ii) of the Employment Agreement, the Court excludes PSMF ¶¶ 207-08 as immaterial.  The Court excludes PSMF ¶¶ 213 and 215-16 for the reasons stated in DDR-PSMF ¶¶ 213 and 215-16 and FDR-PSMF ¶¶ 213 and 215-16.

When Mr. Stuenkel terminated Ms. Scoggins, she raised the question of being on FMLA leave.  (PSMF ¶ 190.)  Later that day, Mr. Stuenkel sent an email to Floyd's Director of Human Resources, Beth Bradford,[49] which stated as follows:

> I told [Ms. Scoggins] she is terminated.  She raised the FMLA issue and I told her she failed to communicate and follow our direction in her treatment plan so our relationship is terminated.  So, no leave.  I told her termination.  We can make it without cause I suppose.

(Id. ¶ 191; see also FDSMF ¶ 152; Pl.'s Ex. 47 [192-17].)[50]

Although Mr. Stuenkel believed that Ms. Scoggins's termination was with cause, he decided as an accommodation to offer her three months' salary and view her termination as without cause, but if she did not accept that offer, then the termination would be with cause.  (PSMF ¶ 212, as modified per FDR-PSMF ¶

---

[49] Floyd promoted Ms. Bradford to Chief Human Resources Officer in November 2014.  (PSMF ¶ 21, as modified per record cited.)

[50] At about 3:00 p.m. on Friday, March 21, which was before Mr. Stuenkel composed the above-quoted email, Dr. Biuso telephoned Ms. Bradford and told her that Mr. Stuenkel was going to fire Ms. Scoggins for not complying with a plan of action that had been outlined for her.  (Bradford Dep. [183] 84-86; see also FDSMF ¶ 151, as modified per record cited.)  However, when Ms. Bradford read the above-quoted email from Mr. Stuenkel, she though it meant that Ms. Scoggins had been terminated without cause.  (Bradford Dep. [183] 103-104.)  That impression was apparently corrected by Monday, March 24, because when she met with plaintiff that day, Ms. Bradford told Ms. Scoggins that Mr. Stuenkel had fired her with cause.  (Id. at 27, 104.)  The Court excludes PSMF ¶ 192 as immaterial.

44

212; see also FDSMF ¶ 153.)  Floyd contends that it terminated plaintiff "with cause" under Section 5(e) of the Employment Agreement.  (PSMF ¶ 203.)

**S.    Post-Termination Events Regarding Ms. Scoggins**

On Monday, March 24, 2014, Ms. Scoggins went to Floyd Behavioral Health for about two hours.  (Scoggins Dep. [186] 170.)  She never returned after this one visit.  (Id. at 250.)  Thus, the only treatment that plaintiff has received for her drug addiction occurred during her few days at Ridgeview.  (FDSMF ¶ 37.) She does, however, participate in a twelve-step support group program.  (PSMF ¶ 160.)[51]

Also on March 24, Ms. Scoggins met with Ms. Bradford.  (FDSMF ¶ 155.) Ms. Bradford told her that Mr. Stuenkel had terminated her with cause under the Employment Agreement.  (Id. ¶ 156.)  Ms. Bradford offered plaintiff a severance agreement with a payout of three months' salary, but she did not sign it.  (Id. ¶ 157.)[52]  According to plaintiff, Ms. Bradford told her that Mr. Stuenkel offered her three months' pay because that was the length of time she might have been on

---

[51] Plaintiff continued to fill prescriptions for opioid medications through October 2014.  (FDSMF ¶¶ 31-32.)  She testified that she weaned herself off of pain pills in late-2014.  (Scoggins Dep. [186] 45-46; see also PSMF ¶ 45.) However, she is still addicted to Ambien.  (FDSMF ¶¶ 33-34.)  A physician who is aware of plaintiff's addiction prescribed her an extended release dosage of that medication.  (PSMF ¶ 46, as modified per record cited.)

[52] The Court excludes FDSMF ¶¶ 154, 158, and 160 as immaterial.

FMLA leave. (PSMF ¶ 193.) Plaintiff told Ms. Bradford that she had gone to Ridgeview and then tried to attend Floyd Behavioral Health's outpatient treatment program. (Id. ¶ 158.) Also on March 24, Mr. Stuenkel sent an email to numerous individuals at Floyd informing them that Ms. Scoggins would "not be returning from her medical leave." (FDSMF ¶ 146; see also FD Ex. U [203-20], at 2.)[53]

When the local newspaper published a story about this litigation,[54] Mr. Stuenkel responded that Floyd does not comment on pending litigation. Given that publicity, he also informed about 150 employees at a Floyd leadership meeting that what they had read in the newspaper was plaintiff's side of the story and that Floyd would vigorously defend itself. Mr. Stuenkel also gave a general recounting of the facts regarding Ms. Scoggins as they occurred to the Polk Medical Center, Inc., to the Cedartown-Polk County Hospital Authority, to

---

[53] The Court sustains plaintiff's objection to FDSMF ¶ 147 for the reasons stated in PR-FDSMF ¶ 147.

[54] The Rome News-Tribune published allegations from plaintiff's initial Complaint, filed November 3, 2014, in its November 12, 2014, edition. See http://www.northwestgeorgianews.com/rome/news/local/former-polk-medical-administrator-sues-floyd-healthcare/article_7ee8a6aa-6a51-11e4-bb4e-07382140cd48.html (last visited May 19, 2016).

Floyd's management board, and to Floyd's senior executive team. (PSMF ¶ 239, as modified per record cited; see also FDSMF ¶ 118.)[55]

Ms. Scoggins sought work as a registered nurse following her termination from Floyd. (FDSMF ¶ 161, as modified per record cited.) She currently works part-time for $35 per hour with benefits. (FDSMF ¶ 159; see also P-SAMF-FD ¶ 16.)[56]

**T.    Floyd's Treatment of Other Addicted Employees**

Mr. Stuenkel has knowledge of three male employees that Floyd sent to inpatient treatment for addiction. (PSMF ¶ 195; see also FDSMF ¶ 167.) Floyd used the Ridgeview program for their treatment. (FDSMF ¶ 164.) Facts related to these three male employees are as follows.[57]

---

[55] There is no evidence that Mr. Stuenkel told 150 executives, department managers, supervisors, and front line supervisors at a leadership meeting of the Cedartown Polk County Hospital Authority and Polk Medical Center, Inc. board that Ms. Scoggins had entered a drug treatment program. Plaintiff's proposed fact (PSMF ¶ 239) erroneously conflates facts related to different events. Thus, the Court has modified it in the text preceding this note to reflect the record. Given the above summary, the Court excludes DDSMF ¶ 46 as duplicative.

[56] The Court excludes as immaterial additional facts that plaintiff proposes about her job search. (See P-SAMF-FD ¶¶ 12-15.)

[57] Plaintiff proposed facts about addiction treatment provided for two (not three as she erroneously asserts) male Floyd employees in which Dr. Hardwell had some involvement. (See PSMF ¶ 194, 196-99; these employees are also discussed at FDSMF ¶¶ 78-80.) Because Dr. Hardwell was not the decisionmaker in either of those two situations or here, and because his testimony shows that neither Dr. Biuso nor Mr. Stuenkel had any involvement in those two situations,

In approximately 2006, a department level manager who reported to Mr. Stuenkel was exhibiting characteristics of addiction (frequent absences, etc.). Floyd's Chief Medical Officer at the time (Dr. Dee Russell) and Mr. Stuenkel met with this individual, who admitted to alcoholism. They told this manager that he was required to seek inpatient treatment or be terminated. The individual agreed to go to treatment (which Floyd arranged), completed the program, and came back after care, but he ultimately resigned and relapsed into alcoholism after leaving Floyd's employment. (FDSMF ¶ 167a, as modified per Stuenkel Dep. [188] 113-18.)

The second instance occurred in approximately 2011 when a physician was exhibiting signs of addiction (alcoholism). Dr. Russell interviewed the doctor,

---

the Court excludes those proposed facts as immaterial. See Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."). In any event, it appears that plaintiff seeks to use the second individual described by Dr. Hardwell as a comparator, asserting that he was not told he would be fired if he refused inpatient treatment. (See PSMF ¶ 199; cited also in Pl.'s Br. [190-1] 20 and Pl.'s Br. [253] 12.) However, construing the record in the light most favorable to the non-moving defendants, the record cannot be read that broadly. Dr. Hardwell testified only that in the intervention meeting he attended, there was no mention of the possible loss of employment for refusing inpatient treatment. Dr. Hardwell did not know whether the possible loss of employment was ever discussed with that individual. (Hardwell Dep. [185] 81-82.) But, even if this one male employee was not given an ultimatum, as discussed infra, three other male employees were, so there is no probative evidence of sex bias in how Floyd has dealt with addicted employees.

who admitted that he had an addiction problem.[58] Floyd required the doctor to attend an inpatient treatment program. He successfully completed treatment and came back to work. Ultimately, after the doctor exhibited behavior suggesting that he was not in recovery, he resigned in lieu of termination. (FDSMF ¶ 167b, as modified per Stuenkel Dep. [188] 120-25; see also PSMF ¶ 200.)

The third instance occurred in approximately 2012 or 2013 with an employee physician who exhibited signs of addiction to prescription medications. In an intervention meeting with Dr. Russell (or possibly Dr. Biuso), the physician was required to attend inpatient treatment or be terminated.[59] The employee completed the treatment successfully and is still employed with Floyd and doing well. (FDSMF ¶ 167c, as modified per Stuenkel Dep. [188] 125-29; see also PSMF ¶ 201.)

Mr. Stuenkel testified that when faced with impaired employees, Floyd seeks to help them by obtaining their agreement to go into an inpatient program and be assessed, and then to start a dialogue about what happens next. (Stuenkel Dep. [188] 119-20; see also PSMF ¶ 186.) Floyd has obtained those agreements

---

[58] Mr. Stuenkel was not present for the meeting, but had approved the plan of action. (Stuenkel Dep. [188] 123-24.)

[59] As before, Mr. Stuenkel was not present for the meeting, but had approved the plan of action. (Stuenkel Dep. [188] 128-29.)

by informing the employees that, if they did not agree to inpatient treatment, then they would be fired.  (Stuenkel Dep. [188] 120.)[60]

According to Mr. Stuenkel, in the past there had been an agreement with the individual to get into a program, get assessed, and come up with a plan via communication back and forth with the individual and the treatment center. (FDSMF ¶ 165.)  He believed that this procedure was in the employee's best interest because it got him help.  Ms. Scoggins was the first employee who had failed to communicate with him during treatment.  (Id. ¶ 166.)

## II.   **SUMMARY JUDGMENT STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact."  Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made

_____

[60] Because plaintiff argues that she was not treated like similarly situated males, and does not base her sex discrimination claim on being replaced by a male, the Court excludes FDSMF ¶¶ 116 and 162-63 as immaterial.

for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). If in response the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate. Rice-Lamar, 232 F.3d at 840. "In determining whether genuine issues of material fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." Id. (citing Anderson, 477 U.S. at 255).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried. Anderson, 477 U.S. at 251. The applicable substantive law will identify those facts that are material. Id. at 248. Facts that are disputed, but

51

which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. Id. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. For factual issues to be "genuine," they must have a real basis in the record. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). When the record as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial." Id. at 587.

Cross-motions for summary judgment do not change the above standard. Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007). Rather, "a court must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Warshauer v. Chao, No. 4:06-CV-0103-HLM, 2008 WL 2622799, at *24 (May 7, 2008) (internal citations and quotations omitted). "Both motions must be denied if there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2009).

III.    **LEGAL ANALYSIS**

Plaintiff's claims for FMLA interference (Count I), FMLA retaliation (Count II), ADA discrimination (Count III), ADA failure to accommodate (Count IV), ADA retaliation (Count V), ADA prohibited examinations, inquiries, and unlawful disclosures of confidential medical information (Count VI), Title VII sex discrimination (Count VII), and breach of contract/stubborn litigiousness (Count X) are alleged only against Floyd.  (Second Am. Comp. ¶¶ 89-142, 157-61.)  Plaintiff's claims for negligence per se (Count VIII), violation of the statute creating the GPDMP (Count IX), and invasion of privacy/wrongful disclosure (Count XI) are alleged against all defendants.  (Id. ¶¶ 143-56, 162-64.)  The Court addresses plaintiff's federal claims against Floyd in Part III.A, and her state law claims in Part III.B.

A.    **Plaintiff's Federal Claims Against Floyd**

1.    **Plaintiff's ADA Claims (Counts III-VI)**

Plaintiff alleges that Floyd violated the ADA by terminating her because it "regarded" her as disabled (Count III); by failing to grant reasonable accommodation for her disability (Count IV); by retaliating against her for exercising her rights (Count V); and by engaging in prohibited examinations and inquiries and unlawful disclosures of confidential medical information (Count VI).

53

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The statute defines a "qualified individual" as someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). The ADA defines "disability" as (1) a physical or mental impairment that substantially limits one or more of the major life activities of the individual, (2) a record of such impairment, or (3) being regarded as having an impairment. Id. § 12102(1). To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that: (1) she has a disability; (2) she is a qualified individual with or without a reasonable accommodation; and (3) she was discriminated against because of her disability. Rossbach v. City of Miami, 371 F.3d 1354, 1356-57 (11th Cir. 2004) (per curiam).

For reasons detailed infra Part III.A.1.a, plaintiff's ADA discrimination (Count III) and failure to accommodate (Count IV) claims fail because she was not a qualified individual given her then current illegal use of drugs. Because plaintiff need not be a qualified individual to pursue claims for retaliation (Count V) and unlawful disclosure of confidential medical information (Count VI), the

54

Court considers those two claims separately <u>infra</u> Part III.A.1.b, but they fail as well.

a)    <u>**Plaintiff's ADA Claims in Counts III and IV**</u>

Plaintiff alleges that Floyd violated the ADA by terminating her because it regarded her as disabled even though she was a qualified individual. (Second Am. Compl. [103] Count III, ¶¶ 105-06.) Ms. Scoggins further alleges that, although she was a qualified individual, Floyd violated the ADA by refusing to grant her request for reasonable accommodation, which was outpatient instead of inpatient drug rehabilitation treatment. (<u>Id.</u> Count IV, ¶¶ 115-16.)

Both of these claims fail because the ADA expressly excludes from the class of qualified individuals protected by the statute any employee "who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a). "This exclusion applies not just to the use of illegal street drugs, but also to the illegal misuse of pain-killing drugs controlled by prescription." <u>Shirley v. Precision Castparts Corp.</u>, 726 F.3d 675, 678 (5th Cir. 2013).

The ADA defines the "illegal use of drugs" as follows:

**(A)    In general**

The term "illegal use of drugs" means the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act [21 U.S.C.A. § 801 <u>et seq.</u>]. Such term does not include the use of a drug taken under supervision by a licensed

55

health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

**(B)    Drugs**

The term "drug" means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act [21 U.S.C.A. § 812].

42 U.S.C. § 12111(6); see also 29 C.F.R. § 1630.3(a) (2016) (tracking language of statute).

The Equal Employment Opportunity Commission's ("EEOC") Interpretative Guidance to Title I of the ADA contains the following commentary on § 1630.3 of its regulations:

Part 1630 provides that an individual currently engaging in the illegal use of drugs is not an individual with a disability for purposes of this part when the employer . . . acts on the basis of such use. Illegal use of drugs refers both to the use of unlawful drugs, such as cocaine, and to the unlawful use of prescription drugs.

Employers, for example, may discharge . . . persons who illegally use drugs, on the basis of such use, without fear of being held liable for discrimination.  The term "currently engaging" is not intended to be limited to the use of drugs on the day of, or within a matter of days or weeks before, the employment act in question.  Rather, the provision is intended to apply to the illegal use of drugs that has occurred recently enough to indicate that the individual is actively engaged in such conduct.

29 C.F.R. § 1630, App. § 1630.3 paras. 1-2; see also Nielsen v. Moroni Feed Co., 162 F.3d 604, 611 n.12 (10th Cir. 1998) ("There is no doubt that, under the ADA,

illegal drug use includes the illegal misuse of pain-killing drugs which are controlled by prescription as well as illegal street drugs like cocaine.").

Possessing a doctor's prescription is not a safe harbor, because the Controlled Substances Act ("CSA") makes it "unlawful for any person knowingly or intentionally . . . to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge[.]" 21 U.S.C. § 843(a)(3).[61] A "subterfuge" is "a scheme, plan, stratagem, or artifice of evasion." Tomblin, 2011 WL 829268, at *4. Thus, for example, persons who obtain drugs through "doctor shopping" violate § 843(a)(3) and do not have lawful prescriptions.[62] See United States v. George, 466 F. App'x 304, 312 (4th Cir.

---

[61] Georgia's criminal code contains an almost identical prohibition, making it unlawful for any person "to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, subterfuge, or theft." O.C.G.A. § 16-13-43(a)(3). Georgia law also makes it unlawful for any person to "withhold information from a practitioner that such person has obtained a controlled substance of a similar therapeutic use in a concurrent time period from another practitioner." Id. § 16-13-43(a)(6). Violation of this statute is punished as a felony. Id. § 16-13-43(b). In discussing a West Virginia statute virtually identical to O.C.G.A. § 16-13-43(a)(6), i.e., W. Va. Code § 60A-4-410(a), a court stated that the "gist of this code section is to criminalize the nondisclosure of concurrent controlled substance prescriptions, thus imposing an affirmative duty on patients to disclose the information." United States v. Tomblin, No. 2:10-CR-00130, 2011 WL 829268, at *4 (S.D. W.Va. Mar. 7, 2011).

[62] Doctor shopping "has traditionally referred to a patient obtaining controlled substances from multiple healthcare practitioners without the prescribers' knowledge of the other prescriptions." Center for Disease Control's "Doctor Shopping Laws," found at http://www.cdc.gov/phlp/docs/menu-

2012) (per curiam) ("A strong argument can likewise be made that none of the drugs George obtained through her doctor-shopping scheme were lawfully obtained."); United States v. Young, 992 F.2d 207, 210 (8th Cir. 1993) (concluding that narcotics prescriptions that defendant obtained by "misleading several different doctors" were not valid prescriptions); United States v. Galyen, 798 F.2d 331, 333 (8th Cir. 1986) (upholding conviction where defendant's conduct, such as driving extra miles to get prescriptions filled at pharmacies in different towns, was adequate to support an inference that he intended to deceive his doctor into prescribing more narcotics, either by failing to mention or by affirmatively denying that he was receiving similar prescriptions from other doctors).

Plaintiff argues that the above exclusion from ADA coverage in § 12114(a) does not apply to her. She claims that she did not engage in the illegal use of drugs because she had prescriptions for all of the drugs that she took. (Pl.'s Br [190-1] 11; Pl.'s Br. [228] 13-14.) Floyd counters that, given the large number of pills for which plaintiff obtained prescriptions, and the many doctors from whom she obtained those prescriptions, plaintiff obtained those prescriptions by

---

shoppinglaws.pdf (last visited June 9, 2016); see also Foister v. Purdue Pharma, L.P., 295 F. Supp. 2d 693, 699 (E.D. Ky. 2003) ("Saylor also engaged in 'doctor shopping,' i.e., simultaneously receiving OxyContin prescriptions from multiple doctors without advising them of the other prescriptions.").

58

misrepresentation, fraud, deception, or subterfuge, and that there was no supervision by a licensed health care professional; thus, Floyd contends that plaintiff falls within the ADA's illegal drug use exclusion. (FD's Br. [201] 10-12; FD's Br. [223] 6.)

Two cases merit extended discussion in this analysis: <u>Shirley v. Precision Castparts Corp.</u>, Civ. Action No. H-11-581, 2012 WL 2577535 (S.D. Tex. July 3, 2012), <u>aff'd</u>, 726 F.3d 675 (5th Cir. 2013), and <u>Pierce v. Highland Falls-Fort Montgomery Central Sch. Dist.</u>, No. 08-civ-1948 (RKE), 2011 WL 4526520 (S.D.N.Y. Sept. 28, 2011).

In <u>Pierce</u>, the plaintiff teacher sued the school district and two supervisors following his suspension and early retirement. <u>Pierce</u>, 2011 WL 4526520, at *3. The defendants argued, <u>inter alia</u>, that even if Pierce were considered a qualified individual under the ADA, his claim would still fail as a matter of law because drug abuse is not a physical or mental impairment that is recognized as a disability under the ADA. <u>Id.</u> at *6. The district court agreed, noting that the evidence shows that, "throughout his employment with the District, Pierce continually engaged in the misuse of prescription drugs." <u>Id.</u> at *7. The district court continued as follows:

> Although the "illegal use of drugs" does not generally include the use of a drug under the supervision of a licensed physician, 42 U.S.C. § 12111(6)(A), it is unlawful under the Controlled Substances Act to "knowingly or intentionally . . . acquire or obtain possession

of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge" as Pierce has done here. 21 U.S.C. § 843(a)(3). Pierce admits to obtaining several prescriptions from various doctors who were unaware "that [he] was getting other prescriptions for those [painkillers] from other people at the same time." Pierce Dep. 37:9-11. Therefore, due to Pierce's behavior, his addiction is not covered as a disability under the ADA.

Id. The district court in Pierce entered summary judgment to the defendants. Id. at *11.

In Shirley, the plaintiff sustained work-related injuries which caused him pain. 2012 WL 2577535, at *1. "He ultimately received multiple prescriptions of Vicodin from different doctors, without informing each doctor about his other prescriptions because he 'didn't want them to know.'" Id. In late-November 2009, Shirley became concerned about the frequency and dosage of his Vicodin usage and voluntarily requested time off from work in order to obtain medical treatment. Id. He received approval for short-term disability leave from his employer's human resources representative, Alan Barnett, which also qualified him for, and ran concurrently with, FMLA leave pursuant to company policy. Id. After conferring with Barnett about facilities, Shirley checked into the Memorial Hermann Prevention and Recovery Center on December 3, 2009, to begin treatment. Id. Two days later, Shirley was discharged early, although in stable condition, at his own request. Id. at *5. Shirley told Barnett that the reason he left Memorial Hermann was because his treating physician, Dr. Leath, wanted to

find an alternative, non-addictive drug for Shirley's pain-management, but Shirley wanted to remain on an opiate drug, as Shirley claimed that opiates were the only type of drug that worked for his pain.  Id.  After leaving treatment, Shirley went to his primary care physician, Dr. Hoefer, who Shirley claims stated that it was "fine" if Shirley continued to take Vicodin for his pain, though Dr. Hoefer was trying to find something non-addictive that would work.  Id.  Shirley obtained a release to return to work from Dr. Hoefer on December 9, 2009.  Id.

When Shirley returned to work, Barnett verbally informed him that leaving the treatment facility before completing treatment amounted to grounds for termination under the employer's Drug-Free Workplace Policy.  Shirley, 2012 WL 2577535, at *1.  Shirley indicated he was unaware of the consequences of leaving treatment.  Id.  Instead of immediately terminating Shirley's employment pursuant to its policy, the employer allowed Shirley to re-enter Memorial Hermann on December 11, 2009.  Id.  Shirley tested positive for hydrocodone when he was readmitted.  Id.  He consented to residential treatment, but he checked out of the program the next day.  Id.  "Shirley's treating physician at Memorial Hermann wrote a note on December 12, 2009, stating 'Has completed detox.  Has not completed treatment.'"  Id.  Shirley admits he continued using Vicodin for at least one year after December 12, 2009.  Id.  The employer terminated Shirley effective December 14, 2009, for his failure to complete the

Memorial Hermann drug treatment program.  Id. at *2.  Shirley filed suit alleging both ADA and FMLA claims.  Id.

In ruling on the employer's motion for summary judgment on the ADA claim, the district court noted that the definition of an individual with a disability does not include someone who is currently engaging in the illegal use of drugs. Shirley, 2012 WL 2577535, at *3.  "'Illegal use of drugs' is defined as 'the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act' (id. quoting 42 U.S.C. § 12111(6)(A)) and 'includes the illegal misuse of pain-killing drugs which are controlled by prescription.'"  Id. (quoting Nielsen, 162 F.3d at 611 n.12).  The district court also quoted the provision from the CSA (i.e., § 843(a)(3)) making it unlawful to knowingly or intentionally acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge.  Shirley, 2012 WL 2577535, at *3.  The district court found that provision of the CSA violated as follows:

> In this case, Shirley was consuming Vicodin, a legally prescribed pain-killing drug.  Although he was initially prescribed the drug lawfully, his use became illegal when he obtained additional prescriptions from other physicians without full disclosure to each. Shirley admits that he did not tell each physician about his other prescriptions because he "didn't want them to know."  Shirley's intentional concealment of his other prescriptions, a material fact, when dealing with each physician clearly amounts to "misrepresentation, fraud, forgery, deception, or subterfuge."

Shirley, 2012 WL 2577535, at *3 (record cite omitted).

Ms. Scoggins seeks to distinguish <u>Pierce</u> and <u>Shirley</u> by arguing that the plaintiffs there acquired drugs in violation of the CSA because they admitted to concealing their drug abuse from doctors in order to obtain more drugs. (Pl.'s Br. [228] 14 & 16 n.4.)   Ms. Scoggins asserts that she made no such admission. However, the undisputed material facts are to the contrary.

The record shows that on July 8, 2013, Ms. Scoggins asked Dr. Bouldin to write her a prescription for Zolpidem (a/k/a Ambien), telling him that she was out of the sleep aid and had not been able to reach Dr. Hampton, her primary care physician, to renew her prescription.   (<u>See</u> <u>supra</u> Part I.G.)   That was a false statement.   The GPDMP printout shows that Ms. Scoggins had filled four prescriptions for Zolpidem between May 15 and June 25, 2013, totaling 80 pills and providing her enough medication to last until August 2 when taken at the recommended dose of one pill per day.[63]   Moreover, when she made her request of Dr. Bouldin on July 8, Ms. Scoggins already possessed an unfilled prescription from Dr. Hampton for another 30 Zolpidem, which she filled on July 10. Therefore, the undisputed facts show that Ms. Scoggins knowingly obtained Zolpidem, a controlled substance, from Dr. Bouldin by misrepresenting that she

---

[63] On May 15, 2013, Dr. Hampton wrote plaintiff three 30-day prescriptions for Zolpidem, which she filled successively on May 15, June 12, and July 10.  In the interim, Dr. Girgis wrote plaintiff two 10-day prescriptions for Zolpidem on June 17, which Ms. Scoggins filled on June 17 and June 25.

had none and could not reach her primary care physician to get more. Like the plaintiffs in Pierce and Shirley, Ms. Scoggins concealed her drug abuse from Dr. Bouldin in order to obtain more drugs.

Review of Ms. Scoggins's GPDMP printout reveals a similar pattern of concealment from many different doctors. Starting on May 15, 2013, Dr. Hampton prescribed (and plaintiff filled at various pharmacies) a twelve months' supply of Zolpidem with a prescribed dosage of one pill per day. During that same twelve-month period, however, plaintiff obtained and filled prescriptions for Zolpidem from five other doctors, for an additional eight and one-half months' supply (given the same prescribed dosage). She could not have obtained so much of this controlled substance without engaging in misrepresentation, deception, or subterfuge to these doctors. Had Ms. Scoggins been truthful to these doctors about her other prescriptions, she could not have obtained so much additional Zolpidem.

The GPDMP printout also reveals that starting March 18, 2013, Drs. Girgis, Seymore, and Mezzatesta of Harbin Pain Clinic successively prescribed (and plaintiff filled) a fourteen months' supply of pain relievers at the prescribed dosage. During that same time period, however, plaintiff obtained and filled prescriptions for pain relievers from six other physicians, for an additional 51

days' supply at the prescribed dosage.[64]  Ms. Scoggins could not have obtained so many opioids and narcotics without engaging in misrepresentation, deception or subterfuge to these doctors.  Again, had Ms. Scoggins been truthful to these doctors about her other prescriptions, she could not have obtained so many additional pain relievers.

No reasonable juror could come to any other conclusion but that Ms. Scoggins engaged in doctor shopping, and that she did not inform the physicians to whom she was making requests for controlled substances that she was concurrently receiving the same drugs from other doctors.  Although plaintiff may have been "in denial" about her condition (see Pl.'s Br. [228] 15 & 16 n.4), that does not change the record evidence, which shows conclusively that Ms. Scoggins was concealing her misuse of prescription drugs from various doctors in order to obtain more.  Her non-disclosure violated both the CSA (21 U.S.C. § 843(a)(3)) and Georgia law (O.C.G.A. § 16-13-43(a)(6)).  Given the large number of drugs and doctors, there was no supervision by a licensed health care professional.

Therefore, the undersigned **REPORTS** that Ms. Scoggins was not a qualified individual under the ADA, and **RECOMMENDS** that plaintiff's

---

[64] The Court excludes prescriptions obtained from Dr. Fletcher related to a dental procedure and the muscle relaxer (Carisoprodol) obtained from Dr. Meier.

Motion for Summary Judgment on her ADA claims in Counts III and IV be **DENIED**, and **RECOMMENDS** that the Floyd's Motion for Summary Judgment on plaintiff's ADA claims alleged in Counts III and IV be **GRANTED**.

### b)    Plaintiff's ADA Claims in Counts V and VI

The Court addresses in this section plaintiff's ADA retaliation claim (Count V) and her claim that Floyd engaged in prohibited examinations and unlawful disclosures of confidential medical information (Count VI).

### (1)    The ADA Retaliation Claims (Count V)

The determination made above that plaintiff was not a qualified individual due to her current illegal drug use is not dispositive of her retaliation claim.  See Branscomb v. Sec'y of the Navy, 461 F. App'x 901, 906 (11th Cir. 2012) (per curiam); Roberts v. Rayonier, Inc., 135 F. App'x 351, 357 (11th Cir. 2005) (per curiam) ("To prove the necessary element of protected activity, Roberts is not required to prove that he was seeking an accommodation for an actual disability covered by the statute.  It is sufficient if he establishes that he had a reasonable belief that he was disabled or regarded as disabled and thus entitled to an accommodation.").[65]

---

[65] See also Tabatchnik v. Cont'l Airlines, 262 F. App'x 674, 676 n.1 (5th Cir. 2008) (per curiam) ("In contrast to an ADA discrimination claim, a plaintiff bringing an ADA retaliation claim need not demonstrate that [s]he has a disability.").  "By its own terms, the ADA retaliation provision protects 'any

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a).  The statute contains both an "opposition clause" and a "participation clause."[66]  Courts assess ADA retaliation claims under the same framework employed for retaliation claims arising under Title VII.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).

To establish a prima facie case of ADA retaliation, a plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action.  Parker v. Econ. Opportunity for Savannah-Chatham Cty. Area, Inc., 587 F. App'x 631, 633 (11th Cir. 2014).  If a plaintiff establishes a prima facie case, then the employer has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action.  Pennington v. City

———————————————

individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997) (quoting 42 U.S.C. § 12203(a)).  "Therefore, [a plaintiff's] failure to prove h[er] disability does not preclude h[er] from attempting to establish a retaliation claim." Tabatchnik, 262 F. App'x at 676 n.1.

[66] Because plaintiff had filed no charge with the EEOC at the time of the adverse action here, she must proceed under the opposition clause.  Smith v. Wynfield Dev. Co., 451 F. Supp. 2d 1327, 1349 (N.D. Ga. 2006).

of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the employer does so, then the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct.  Id.

Plaintiff asserts that she was terminated in retaliation for (1) requesting that she be granted the accommodation of taking outpatient drug treatment at Floyd Behavioral Health Center instead of inpatient treatment at Ridgeview, and (2) refusing to sign a release granting Dr. Biuso and Mr. Stuenkel access to her medical information.  (Pl.'s Br. [190-1] 18; Pl.'s Br. [228] 25.)[67]  The Court considers these retaliation claims separately below.

### (a)    **Outpatient Drug Treatment**

With regard to the first prima facie element, a request for accommodation constitutes statutorily protected activity, but only if the plaintiff "had a good faith, objectively reasonable belief that he was entitled to those accommodations under

───────────────

[67] Count V alleges only that Floyd retaliated against plaintiff in response to her request for reasonable accommodation.  (See Second Am. Compl. [103] ¶ 125.)  However, plaintiff alleges elsewhere in that Complaint that Dr. Biuso admonished her for refusing to sign a consent form allowing Floyd access to her personal and protected medical and psychological records from Ridgeview (id. ¶¶ 72, 74), and that she told Mr. Stuenkel she would not sign a consent (id. ¶ 77).  The defendants have not argued that the retaliation claim presented in plaintiff's briefs exceeds the allegations of the Second Amended Complaint.  Thus, the Court considers termination for refusal to sign a release as a separate basis of alleged retaliation.

the ADA." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998); see also Doan v. San Ramon Valley Sch. Dist., No. C 13-03866 CRB, 2014 WL 2038331, at *3 (N.D. Cal. May 16, 2014) ("For example, asking for an accommodation is a type of protected activity under the ADA."). The objective reasonableness of plaintiff's belief that she was entitled to the requested accommodation of outpatient drug treatment instead of what Floyd demanded, which was inpatient drug treatment, "must be measured against existing substantive law." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).

The existing substantive law holds that employers like Floyd need not provide reasonable accommodation to employees like Ms. Scoggins who are currently engaged in the illegal use of drugs. See Salley v. Circuit City Stores, Inc., 160 F.3d 977, 981 (3d Cir. 1998) ("Congress has decided to treat drug and alcohol addiction differently from other disabilities by ensuring that employers do not have to go through the accommodation process in these cases."); Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1086 (10th Cir. 1997) ("[E]mployers need not make any reasonable accommodations for employees who are illegal drug users and alcoholics."); Quinones v. Univ. of P.R., No. CIV. 14-1331 JAG, 2015 WL 631327, at *5 (D.P.R. Feb. 13, 2015) ("[I]t is clear from both the text of the ADA and its legislative history that Congress intended to treat drug addiction

differently from other impairments and disabilities by allowing employers not to go through the reasonable accommodation process and, instead, terminate their employees on the basis of their drug use[.]"); <u>E.E.O.C. v. Grane Healthcare Co.</u>, 2 F. Supp. 3d 667, 702 (W.D. Pa. 2014) (ADA does not require covered employers to reasonably accommodate individuals whose shortcomings are attributable to ongoing drug and alcohol addiction); and <u>Veltri v. Thompson Consumer Elecs., Local No. 178</u>, No. 3:CV-02-0645, 2004 WL 1490522, at *5 (M.D. Pa. May 18, 2004) ("Her alleged disability due to chemical dependency was not subject to accommodation.").

Because plaintiff had no right to reasonable accommodation given her current illegal use of drugs, she could not have had a good faith, objectively reasonable belief that she was entitled to it. Thus, her request for accommodation does not constitute statutorily protected activity and her opposition clause claim fails. Accordingly, the undersigned **RECOMMENDS** that plaintiff's Motion for Summary Judgment on this part of the retaliation claim alleged in Count V be **DENIED,** and **RECOMMENDS** that Floyd's Motion for Summary Judgment on this part of plaintiff's retaliation claim alleged in Count V be **GRANTED**.

### (b)    Refusal to Sign a Release

Although the Second Amended Complaint and plaintiff's briefs describe this claim as arising out of her refusal to sign a release that would have given her

employer access to her medical information, the facts the parties propose describe it in a slightly different manner.[68]  As discussed supra, Floyd sought plaintiff's signature on a release (or consent) so as to facilitate a conversation with Ms. Scoggins and the Ridgeview Program Director while Floyd was sponsoring her treatment so that it could determine how she was going to integrate back into the organization after its conclusion.  (FDSMF ¶ 108.)  Plaintiff concurs by summarizing in her response to that proposed fact testimony by Mr. Stuenkel which makes the same point, i.e., that he wanted the release in order to obtain information about her treatment from Dr. Lynn at Ridgeview so he could determine what the next steps in Floyd's relationship with Ms. Scoggins might be.  (PR-FDSMF ¶ 108.)  Floyd adds that, through the release, it was not seeking access to plaintiff's medical records, the individual entries therein, or the prescription treatment.  (FDSMF ¶ 109.)  Although plaintiff objected to the previous proposed fact on relevance grounds, she did not deny the facts stated therein; moreover, her objection cites testimony by Mr. Stuenkel that Floyd sought her signature on the release to be able to communicate with Ridgeview personnel to determine what the next steps would be in its relationship with her by learning about the length of the inpatient program, what the outpatient

─────────────────────

[68] The parties did not cite to a copy of this release (or consent) so that the Court might know its actual terms.

71

program might look like, and what the timeline for these programs might be. (Stuenkel Dep. [188] 136, cited in PR-FDSMF ¶ 109.)  Plaintiff then proposed (and the Floyd defendants admitted) that while she was at Ridgeview, Dr. Lynn asked her if she would sign a consent form to allow him to talk with Dr. Biuso, but she refused.  (PSMF ¶ 162.)  Plaintiff further proposed (and the Floyd defendants admitted) that after her release from Ridgeview, Mr. Stuenkel told her that she had failed to provide authorization for him to talk with her medical providers.  (Id. ¶ 172.)

From all these facts, it is undisputed that the release plaintiff refused to sign would have allowed her healthcare providers at Ridgeview to discuss their treatment of her for drug addiction with Floyd personnel.  The issue then is whether plaintiff's refusal to sign that release constituted statutorily protected activity.[69]

Congress enacted the ADA to help eliminate discrimination against individuals with disabilities.  See 42 U.S.C. § 12101(b).  As part of this effort, the ADA restricts an employer's ability to conduct medical examinations and make inquiries.  Id. § 12112(d)(1).  The ADA contains separate rules for pre-offer job applicants, id. § 12112(d)(2); post-offer but pre-employment entrance

---

[69] Plaintiff cites no cases holding that her refusal to sign such a release constitutes statutorily protected activity.

examinations, id. § 12112(d)(3); and examinations and inquiries of current employees, id. § 12112(d)(4).

Because Ms. Scoggins was then a current Floyd employee, § 12112(d)(4) applies to her and states in relevant part as follows:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). This prohibition applies to all employees, regardless of whether they qualify as disabled under the ADA. See Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1310 (11th Cir. 2013) ("Today we conclude, as have other circuits, that § 12112(d)(4)(A) protects employees who are not disabled.").

"Only disability-related inquiries and medical examinations are subject to the ADA's restrictions." Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA), EEOC Notice No. 915.002, July 27, 2000, 2000 WL 33407181, at *3 (available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html, last visited, June 9, 2016) ("EEOC's Enforcement Guidance").[70] Thus, the Court first

---

[70] Although administrative interpretations of an Act by its enforcing agency are not controlling, they do constitute a body of experience and informed judgment to which a court may properly resort for guidance. See Harrison v.

examines what a "medical examination" is and then what a "disability-related inquiry" is to help decide whether plaintiff's refusal to sign this release was protected activity.

"The ADA's legislative history provides little insight into the intended meaning or scope of the term 'medical examination' in § 12112(d)(4)." Kroll v. White Lake Ambulance Auth., 691 F.3d 809, 815 (6th Cir. 2012). Thus, the EEOC's Enforcement Guidance is "the best interpretive aid." Id. The EEOC's Enforcement Guidance defines a "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health." EEOC's Enforcement Guidance, 2000 WL 33407181, at *3. The EEOC provides the following seven-factor test for analyzing whether a procedure or test qualifies as a medical examination:

(1)    whether the test is administered by a health care professional;

(2)    whether the test is interpreted by a health care professional;

(3)    whether the test is designed to reveal an impairment or physical or mental health;

(4)    whether the test is invasive;

(5)    whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task;

────────────────────

Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1214 (11th Cir. 2010) (discussing EEOC's Enforcement Guidance).

(6)    whether the test normally is given in a medical setting; and,

(7)    whether medical equipment is used.

Id.  The EEOC's Enforcement Guidance notes that in many cases, a combination of factors will be relevant in determining whether a procedure or test is a medical examination, but in other cases, one factor may be enough.  Id. at 4.

The undisputed facts show that Floyd sent plaintiff to Ridgeview for treatment for her drug addiction.  Ridgeview alone conducted the inpatient drug abuse treatment and determined what occurred there.  There is no evidence that Floyd, in the words of the ADA, "require[d] a medical examination of plaintiff." See 42 U.S.C. § 12112(d)(4)(A).  Therefore, this prohibition against medical examinations contained in the statute does not apply here.

With regard to the second phrase in § 12112(d)(4)(A), a "disability-related inquiry" is a "question (or series of questions) that is likely to elicit information about a disability."  EEOC's Enforcement Guidance, 2000 WL 33407181, at *3. According to the EEOC, disability-related inquiries may include the following:

- asking an employee whether s/he has (or ever had) a disability or how s/he became disabled or inquiring about the nature or severity of an employee's disability;

- asking an employee to provide medical documentation regarding his/her disability;

- asking an employee's co-worker, family member, doctor, or another person about an employee's disability;

- asking about an employee's genetic information;

- asking about an employee's prior workers' compensation history;

- asking an employee whether s/he currently is taking any prescription drugs or medications, whether s/he has taken any such drugs or medications in the past, or monitoring an employee's taking of such drugs or medications; and,

- asking an employee a **broad** question about his/her impairments that is likely to elicit information about a disability (e.g., What impairments do you have?).

Id. (footnotes omitted).

The evidence related to this claim shows that Floyd did not make any disability-related inquiries of Ms. Scoggins.  Instead, Floyd wanted her to sign a release so that it could ask questions of her doctors at Ridgeview.  In this scenario, the third example in the above-quoted list of potentially unlawful disability-related inquiries (i.e., "asking an employee's . . . doctor . . . about an employee's disability") may apply.  If Floyd sought the release so that it could ask Ridgeview personnel about any disability plaintiff may have had, then that may have been unlawful.  However, "**Questions that are not likely to elicit information** about a disability are *not* disability-related inquiries and, therefore, are not prohibited under the ADA."  See EEOC's Enforcement Guidance, 2000 WL 33407181, at *3 (emphasis in original).

The Court must view the inquiries that Floyd wanted to make of plaintiff's doctors at Ridgeview against the backdrop of what occurred here.  Plaintiff was at Ridgeview because Floyd sent her there for treatment for addiction to prescription drugs.  As already ruled, Ms. Scoggins was currently engaged in the illegal use of drugs.  It is acceptable for an employer to ask "an employee about his/her current illegal use of drugs."  EEOC's Enforcement Guidance, 2000 WL 33407181, at *3.  In a footnote following that quoted language, the EEOC opines:  "An individual who currently uses drugs illegally is not protected under the ADA; therefore, questions about current illegal drug use are not disability-related inquiries."  Id. at *17 n.27 (citing 42 U.S.C. § 12114(a) and 29 C.F.R. § 1630.3(a)).  If it was permissible to make inquiries of plaintiff about her current illegal drug use, then it would be permissible to make inquiries of her doctor about her current illegal drug use.

The record shows that, had plaintiff signed the release, Floyd's inquiries of the doctors at Ridgeview would not have elicited information about a disability.  Instead, Mr. Stuenkel wanted the release in order to obtain information about plaintiff's treatment for drug abuse by Dr. Lynn at Ridgeview so he could determine what the next steps in Floyd's relationship with Ms. Scoggins might be.  (PR-FDSMF ¶ 108.)  He wanted details like the length of the inpatient program, what the outpatient program might look like, and what the timeline for these

programs might be.  (FDSMF ¶ 109.)  Although some of Ms. Scoggins's medical information might have been disclosed in those inquiries, the focus of the inquiries would have been on how plaintiff was progressing in her treatment for current illegal drug use and when she could return to work.

With regard to the first prima facie element of a retaliation claim, plaintiff's refusal of Floyd's request that she sign a release constitutes statutorily protected activity only if she had a good faith, objectively reasonable belief that Floyd was not allowed to make inquiries of her doctor about her current illegal drug use.  As with the other opposition clause retaliation claim discussed above, the objective reasonableness of plaintiff's belief must be measured against existing substantive law.  Because the existing substantive law allows Floyd to make inquires of the doctor treating an employee for current illegal drug use, plaintiff's refusal to sign the release was not statutorily protected activity and her opposition clause claim fails.  Accordingly, the undersigned **RECOMMENDS** that plaintiff's Motion for Summary Judgment on this part of the retaliation claim alleged in Count V be **DENIED,** and **RECOMMENDS** that Floyd's Motion for Summary Judgment on this part of plaintiff's retaliation claim alleged in Count V be **GRANTED**.

### (2)    Prohibited Examinations/Unlawful Disclosures Claim (Count VI)

In Count VI, plaintiff alleges that Floyd (1) engaged in prohibited examinations and inquiries and (2) unlawful disclosures of confidential medical information, both of which violate the ADA.  The Court addresses these claims separately below.

In her summary judgment brief, plaintiff supports her claim that Floyd engaged in prohibited examinations and inquiries as follows:  "There is no justification under § 12112[d](4)(A) for the demand by Dr. Biuso and Stuenkel for Mrs. Scoggins to sign consent forms to release records to them . . . ."  (Pl.'s Br. [190-1] 19.)  She cites no case law supporting this claim.

With regard to claims under 42 U.S.C. § 12112(d)(4)(A) (quoted supra), as already discussed, Floyd cannot be liable for requiring a medical examination since there is no evidence that it required one from plaintiff.  Floyd also cannot be liable under § 12112(d)(4)(A) because, as also discussed supra, it did not make any disability-related inquiries of either Ms. Scoggins or her doctor.  Although plaintiff argues, as quoted above, that there was no justification under § 12112(d)(4)(A) for the demand by Dr. Biuso and Mr. Stuenkel that she sign the release, simply making the demand creates no liability, because only a medical examination or a disability-related inquiry violates the statute.  Neither occurred here.

As for plaintiff's claim that Floyd engaged in unlawful disclosures of confidential medical information, she argues as follows:  "There is no justification under . . . §§ 12112[d](4)(C) and (3)(B) for the disclosure of her prescription drug history or medical condition to anyone beyond Dr. Bouldin, and certainly not to the group of over 150 people by Stuenkel."  (Pl.'s Br. [190-1] 19.)[71]  Again, Ms. Scoggins cites no case law supporting this claim, and it fails under the plain terms of the statutes she cites.

Section 12112(d)(4)(C) provides as follows:  "Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3)."  42 U.S.C. § 12112(d)(4)(C).

Subparagraph (B) of § 12112(d)(4), which is referenced in the above-quoted statute, provides as follows:

**(B)    Acceptable examinations and inquiries**

A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site.  A covered entity may make inquiries into the ability of an employee to perform job-related functions.

--------

[71] As already discussed (see supra note 55), there is no evidence that Mr. Stuenkel disclosed plaintiff's prescription drug history or medical condition to a group of over 150 people.

42 U.S.C. § 12112(d)(4)(B).

Subparagraphs (B) and (C) of paragraph (3), which are also referenced in

42 U.S.C. § 12112(d)(4)(C), provide as follows:

> A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—
>
>> . . .
>
> (B)    information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—
>
>> (i)    supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;
>>
>> (ii)   first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and
>>
>> (iii)  government officials investigating compliance with this chapter shall be provided relevant information on request; and
>
> (C)    the results of such examination are used only in accordance with this subchapter.

42 U.S.C. § 12112(d)(3)(B), (C).

Read together, § 12112(d)(4)(B), § 12112(d)(4)(C), and § 12112(d)(3)(B)

require an employer who conducts voluntary medical examinations (and obtains

voluntary medical histories) during an employee health program available to

employees at a work site (i.e., "health fairs") to collect and maintain that information on separate forms and in separate medical files and to treat it as a confidential medical record. Read together, these three statutory provisions also require an employer who makes inquiries into the ability of an employee to perform job-related functions to collect and maintain that information on separate forms and in separate medical files and to treat it as a confidential medical record.

The statutory provisions cited by plaintiff have no application here, because there is no evidence that Floyd obtained plaintiff's prescription drug history or information about her medical condition (1) as part of an employee health program available to employees at a work site or (2) when making inquiries into her ability to perform job-related functions. If such information was not obtained in either manner, then there is no obligation under the ADA to maintain that information on separate forms and in separate medical files and to treat it as a confidential medical record.

The undersigned **REPORTS** that plaintiff's claims in Count VI (i.e., prohibited examinations and inquiries and unlawful disclosures of confidential medical information) fail as a matter of law, and thus **RECOMMENDS** that plaintiff's Motion for Summary Judgment on those claims be **DENIED,** and **RECOMMENDS** that Floyd's Motion for Summary Judgment on those claims be **GRANTED**.

## 2.    Plaintiff's FMLA Claims (Counts I and II)

The FMLA "creates two types of claims:  interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."  Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (internal quotation marks omitted).  Ms. Scoggins alleges both claims here.

### a)    Plaintiff's FMLA Interference Claim (Count I)

"To establish an interference claim, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied."  Hurlbert, 439 F.3d at 1293 (internal quotation marks omitted).  The employee need not allege that her employer intended to deny the benefit, because "the employer's motives are irrelevant."  Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1208 (11th Cir. 2001).

"[A]n eligible employee shall be entitled to a total of 12 weeks of leave during any 12-month period . . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D); see also Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 669 (7th Cir. 2011) (to be entitled to FMLA leave, the

employee must have suffered from a serious health condition that left him unable to perform the functions of his job).  The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).

Under the United States Department of Labor's ("DOL") FMLA regulations, "[s]ubstance abuse may be a serious health condition if the conditions of §§ 825.113 through 825.115 are met."  29 C.F.R. § 825.119; see also Darst v. Interstate Brands Corp., 512 F.3d 903, 908 (7th Cir. 2008) ("[S]ubstance abuse may be a Serious Health Condition under certain conditions but FMLA leave may be taken only for treatment for substance abuse.").  "Without a 'serious health condition' within the meaning of the FMLA, an employee isn't entitled to FMLA leave, and so can't succeed on a FMLA interference claim."  Sahlhoff v. Gurley-Leep Auto. Mgmt. Corp., No. 3:14CV1790RLM-CAN, 2015 WL 5692154, at *2 (N.D. Ind. Sept. 28, 2015).

Floyd argues that Ms. Scoggins did not have a "serious health condition" that made her unable to perform the functions of her position.  Defendant supports this argument with citations to plaintiff's deposition, where she testified that her drug use "did not affect [her] job performance" (Scoggins Dep. [186] 37),

84

or "did not affect my work performance" (id. at 88; see also FDSMF ¶ 42, admitted by plaintiff).  (FD's Br. [201] 20-21.)  Plaintiff responds that she had a serious health condition because the FMLA "defines such a condition as one requiring 'continuing treatment by a healthcare [sic] provider.  *See* 29 U.S.C. § 261[1](11)(B)."  (Pl.'s Br. [190-1] 4.)  With reference to the DOL's interpretative regulations, plaintiff adds that "she needed 'treatment by a health care provider' two or more times within the first 30 days, or on at least one occasion with continuing treatment.  29 C.F.R. § 825.115."  (Pl.'s Br. [228] 21.)

Plaintiff does not cite the specific subsection of § 825.115 on which she relies.  However, given her arguments, it appears that plaintiff is asserting that she met the requirements of "continuing treatment" set out in either § 825.115(a)(1) or (a)(2).  These provisions provide as follows:

> A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
> (a)   Incapacity and treatment.  A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> > (1)   Treatment two or more times, within 30 days of the first day of incapacity . . .; or
> >
> > (2)   Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.  . . . .

29 C.F.R. § 825.115(a)(1)-(2).

The problem with plaintiff's argument is that she fails to account for the requirement stated in the DOL's FMLA regulations that she have a period of incapacity[72] of **more** than three consecutive, full calendar days **and** subsequent treatment by a health care provider relating to the same condition two or more times within 30 days of the first day of incapacity, or treatment by a health care provider on at least one occasion with a regime of continuing treatment. See Murray v. Red Kap Indus., Inc., 124 F.3d 695, 698 (5th Cir. 1997) (when employee alleges that he has a serious health condition involving continuing treatment by a health care provider, he must first demonstrate a period of incapacity).

By her own testimony, plaintiff had no problem working on Friday, March 14, 2014. After Floyd sent her to Ridgeview, plaintiff arrived there after dinner on Friday, and after a three-to-four hour intake process, got to her room at about 1:00 a.m. on Saturday morning, March 15. (Scoggins Dep. [186] 129.) She left Ridgeview, according to the Discharge Summary ([203-19] 4), on Monday, March 17, at 10:00 a.m. Thus, plaintiff was in Ridgeview for a partial day on

---

[72] "The term incapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

Friday, all day Saturday, all day Sunday, and a partial day on Monday. That is not a "period of incapacity of more than three consecutive, full calendar days" that is required under the DOL's FMLA regulation. See Russell v. N. Broward Hosp., 346 F.3d 1335, 1343-45 (11th Cir. 2003) (holding that partial days of incapacity do not count towards incapacity period and that the regulation requires "more than three consecutive whole days of incapacity").[73]

Under the rationale in Russell, Ms. Scoggins had only two consecutive whole days of incapacity. Moreover, after she returned home, plaintiff points to no probative evidence showing that she was incapacitated, i.e., unable to "work . . . or perform other regular daily activities due to any serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). Instead, the record shows that, after plaintiff returned home, she spent time on the internet, on the telephone, visiting with family, and at the lake. Therefore, without the requisite period of incapacity of more than three consecutive, full

---

[73] Russell applied an earlier version of the regulation that was then codified at 29 C.F.R. § 825.114(a)(2)(i). Russell, 346 F.3d at 1342. "In the 2009 regulations, the DOL attempted to eliminate confusion by changing the FMLA's incapacity language from 'a period of incapacity of more than three consecutive calendar days' to 'a period of incapacity of more than three consecutive, *full* calendar days.'" Wilson v. Sharp Mfg. Co. of Am., No. 10-2648 ML/P, 2012 WL 489203, at *6 n.5 (W.D. Tenn. Jan. 27, 2012), R. & R. adopted, No. 2:10-CV-02648-JPM, 2012 WL 489198 (W.D. Tenn. Feb. 14, 2012). The DOL's 2009 revision to the regulation reinforces the correctness of the Eleventh's Circuit's holding in Russell.

calendar days, plaintiff cannot satisfy either of the two prongs in the DOL regulation she cites--29 C.F.R. § 825.115.[74]

However, plaintiff may still proceed under 29 U.S.C. § 2611(11)(A), which defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility . . ." 29 U.S.C. § 2611(11)(A). Plaintiff has argued strenuously that Floyd acted inappropriately by threatening to fire her if she did not go to Ridgeview for inpatient treatment, and that she did not need inpatient treatment. (See, e.g., Second Scoggins Decl. [226-1] ¶ 2 ("I have testified in this case about how I did not need the extreme measure of inpatient addiction treatment that Defendants Dr. Biuso and Kurt Stuenkel forced on me, but wanted the more appropriate outpatient treatment.").) Given those arguments, she relegated the following assertion to a footnote: "Mrs. Scoggins maintains that

---

[74] Although plaintiff visited Floyd Behavioral Health on Friday, March 21 for an assessment, she only went there once for treatment on Monday, March 24, but because there were not enough patients present for a session, she left after only two hours and never went back. Thus, there is no evidence that plaintiff satisfied either § 825.115(a)(1) or (a)(2). Plaintiff apparently recognizes that she failed to satisfy those requirements when she argues that "she *needed* 'treatment by a health care provider' two or more times within the first 30 days, or on at least one occasion with continuing treatment." (Pl.'s Br. [228] 21 (emphasis added).) However, plaintiff cites no case which would allow this Court to find that she had a serious health condition based on potential, but not actual, treatment.

her substance abuse disorder did not require inpatient treatment, . . . but even if it did, this constitutes a *per se* 'serious health condition' within the meaning of the 29 U.S.C. § 261[1](11)(A)."  (Pl.'s Br. [190-1] 5 n.2; see also Pl.'s Br. [228] 21 n.8.)  Plaintiff is in the unusual position of arguing that the very inpatient care she claims she neither wanted nor needed allows her to satisfy the definition of "serious health condition" found in 29 U.S.C. § 2611(11)(A).

"Inpatient care means an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.114.  Although Ms. Scoggins is adamant that she did not need it, Floyd required her upon pain of termination to have inpatient care at Ridgeview. This resulted in an overnight stay (or more precisely, three nights) in a residential medical care facility, which satisfies this element of the statutory definition.

However, plaintiff must also submit proof that this serious health condition made her "unable to perform the functions of [her] position."  29 U.S.C. § 2612(a)(1)(D).  As already noted, Floyd argues that plaintiff cannot make this showing because she testified that her drug abuse never impacted her work performance.  But, she was forced to miss work.  The following DOL regulation discusses when an employee is unable to perform the functions of her position:

(a) Definition.  An employee is unable to perform the functions of the position where the health care provider finds that the employee is

89

> unable to work at all or is unable to perform any one of the essential
> functions of the employee's position within the meaning of the
> Americans with Disabilities Act (ADA), as amended, 42 U.S.C.
> 12101 et seq., and the regulations at 29 CFR 1630.2(n).    An
> employee who must be absent from work to receive medical
> treatment for a serious health condition is considered to be unable to
> perform the essential functions of the position during the absence for
> treatment.

29 C.F.R. § 825.123(a).

The first sentence of the above definition assumes that a health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position within the meaning of the ADA or its regulations.  Plaintiff has not directed the Court to any such finding by a health care provider.

Under the second sentence of the above definition, "[A]n employee 'who must be absent from work to receive medical treatment for a serious health condition' is automatically considered unable to perform her essential job functions during that absence."  Lynch v. Klamath Cty. Sch. Dist., No. 1:13 CV 02028-CL, 2015 WL 2239226, at *6 (D. Or. May 12, 2015) (quoting 29 C.F.R. § 825.123(a)).

> In other words, an employee who receives treatment for a serious
> health condition is automatically considered to be unable to perform
> the functions of her position.  Importantly, § 825.123 uses the word
> "must" to imply that the employee's absence is necessary for that
> employee's treatment.

90

Jones v. C & D Techs., Inc., 684 F.3d 673, 677 (7th Cir. 2012).  "As the Seventh Circuit's analysis indicates, in order to show that the employee must be absent from work to receive medical treatment for a serious health condition, the employee must establish:  (1) that the treatment to be received was necessary; and (2) that to undergo the treatment, the Plaintiff needed to be absent from work." Attakora v. D.C., 951 F. Supp. 2d 179, 184 (D.D.C. 2013); accord Stewart v. White, 61 F. Supp. 3d 118, 134 (D.D.C. 2014).

In the unusual situation presented here, plaintiff satisfies 29 U.S.C. § 2611(11)(A) because her inpatient care shows that she had a serious health condition, and she satisfies 29 U.S.C. § 2612(a)(1)(D) because, during the inpatient treatment that Floyd believed was necessary, Ms. Scoggins had to be absent from work and was unable to perform the essential functions of the position during that absence.  Accordingly, she was entitled to FMLA leave under 29 U.S.C. § 2612(a)(1).[75]  However, Floyd denied FMLA leave to her, which gives her an interference claim.  See Hurlbert, 439 F.3d at 1293.

_____

[75] Plaintiff asserts that Mr. Stuenkel told her she would be placed on FMLA leave, and points to evidence showing that Floyd understood her to be on medical leave.  (See Pl.'s Br. [228] 21; Pl.'s Br. [253] 4.)  Floyd denies that Mr. Stuenkel made any statement of the sort or that a reference to plaintiff being on medical leave equals FMLA leave.  (See FD's Br. [248] 11; FD's Br. [201] 21.)  However, this raises a fact dispute that this Court cannot resolve on summary judgment. Floyd also argues that, if plaintiff had been placed on FMLA leave, then she lost the statute's protection when she did not use that leave for its intended purpose

However, the Court cannot recommend entry of summary judgment for plaintiff because Floyd argues that it would have discharged her even if she had not been on FMLA leave.  See Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010); O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1353-54 (11th Cir. 2000).  Floyd shows that it fired plaintiff because of her insubordination, failure to communicate, and failure to complete the agreed treatment plan.  (FD's Br. [223] 3.)  Plaintiff disputes those contentions, pointing to evidence showing that she was not insubordinate, and that she went to Ridgeview as demanded, but that she left after completing the inpatient portion, declining to stay there for a residential outpatient program, and opting instead to pursue outpatient treatment at facilities recommended by Ridgeview's Dr. Lynn.

Floyd cites in support of this argument the Shirley case, discussed supra Part III.A.1.a in connection with the plaintiff's ADA claim.  However, as shown below, significant differences between the facts in Shirley and the disputed facts here prevent this Court from recommending summary judgment for Floyd on this argument.

---

(i.e., she researched outpatient options and went to the lake).  (FD's Br. [201] 21-22.)  The Court agrees with plaintiff that the cases cited by Floyd are inapposite (see Pl.'s Br. [228] 21-22), but even if they are apposite, given this fact dispute, a jury should decide whether Ms. Scoggins was misusing FMLA leave, not this Court.

In <u>Shirley</u>, the employer had a drug-free workplace policy which provided that any employee who developed a problem with drugs or alcohol could confidentially inform the human resources ("HR") manager and then pursue treatment. <u>Shirley</u>, 726 F.3d at 677. Under that policy, any employee who rejected treatment, or who left a treatment program before being properly discharged, would be terminated. <u>Id.</u> [76] The employer fired Mr. Shirley for twice failing to complete the Memorial Hermann treatment program. <u>Id.</u> He then filed suit under both the ADA (discussed <u>supra</u>) and the FMLA. <u>Id.</u>

Mr. Shirley claimed that his termination interfered with his right to return to work following FMLA leave. <u>Shirley</u>, 726 F.3d at 681. However, the court noted that this right to return is not unlimited, as an employer may show that it terminated the employee for reasons unrelated to the FMLA leave. <u>Id.</u> at 681-82. Because a legitimate cause for termination precludes an FMLA claim, the Fifth Circuit held that Mr. Shirley had to present evidence sufficient to raise a jury

---

[76] Treatment for drug addiction involves two distinct, sequential components. <u>Shirley</u>, 726 F.3d at 677. In the first step, the patient must detoxify, which cleanses his body of the drug. <u>Id.</u> In the second step, the patient must undergo treatment that addresses the addiction by helping him curb his need for the drug. <u>Id.</u> at 677-78.

question that his employer's reason for firing him—violating its drug-free workplace policy—was pretextual. Id. at 683.[77]

Mr. Shirley attempted to show pretext by arguing that his employer misapplied the drug-free workplace policy. Shirley, 726 F.3d at 683. Although he left Memorial Hermann's program after detox but before treatment, he argued that treatment was always contemplated to occur with his primary care physician. Id. The employer countered that the term "treatment program" in its policy meant the entire program—both detox and post-detox treatment—and that the plaintiff violated the policy when he began but did not complete the treatment program at Memorial Hermann. Id. Because the plaintiff offered no evidence of discriminatory application of the drug-free workplace policy, or of hostility

_____

[77] The Fifth Circuit noted that a DOL regulation allows termination of employees for substance abuse even if they are on FMLA leave. Shirley, 726 F.3d at 683 n.39. That regulation provides in relevant part as follows:

> Treatment for substance abuse does not prevent an employer from taking employment action against an employee. The employer may not take action against the employee because the employee has exercised his or right to take FMLA leave for treatment. However, if the employer has an established policy, applied in a non-discriminatory manner that has been communicated to all employees, that provides under certain circumstances an employee may be terminated for substance abuse, pursuant to that policy the employee may be terminated whether or not the employee is presently taking FMLA leave.

29 C.F.R. § 825.119(b).

toward his decision to take medical leave, or of his employer's reluctance to abide more generally by the FMLA's dictates, the Fifth Circuit affirmed the entry of summary judgment against his FMLA claim.  Id.

Unlike in Shirley, where the employer's demands were clear—complete the treatment program at Memorial Hermann or be terminated—there is a fact dispute here over Floyd's demands.  Although it is undisputed that Floyd made plaintiff's completion of inpatient treatment at Ridgeview a condition of continued employment, Mr. Stuenkel admitted that he did not tell plaintiff how long she had to stay at Ridgeview; instead, the length of her inpatient treatment and the length of her outpatient treatment were decisions to be made between plaintiff and the doctors there.  Plaintiff asserts that she completed inpatient treatment; that Dr. Lynn gave her a list of acceptable outpatient treatment centers; that he gave her an administrative discharge; and she was set to begin outpatient treatment, one week after she left Ridgeview, at a place (Floyd Behavioral Health) that was closer to her home and less expensive.  Moreover, unlike the employer in Shirley, Floyd has not argued that it fired Ms. Scoggins for violating its drug-free workplace policy. [78]  Thus, Shirley does not require entry of summary judgment against Ms. Scoggins's FMLA claim.

––––––––––––––––––––

[78] Floyd has likely not argued that plaintiff violated its drug-free workplace policy because Floyd failed to follow it.  Under that policy, if management elects

As noted above, there are disputed issues of material fact over whether Floyd would have discharged plaintiff even if she had not been on FMLA leave. The fact finder must determine whether plaintiff was insubordinate, failed to communicate, and/or failed to complete the agreed treatment plan (whatever its terms were).[79] Therefore, given the disputed material facts on the FMLA interference claim (Count I), the undersigned **RECOMMENDS** that plaintiff's Motion for Summary Judgment on this claim be **DENIED**, and that Floyd's Motion for Summary Judgment on this claim also be **DENIED**.

### b)    Plaintiff's FMLA Retaliation Claim (Count II)

"Unlike an interference claim, an employee 'bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus.'" Martin v. Brevard Cty. Pub. Sch., 543 F.3d 1261, 1267-68 (11th Cir. 2008) (per curiam) (quoting Strickland, 239 F.3d at 1207). Where a plaintiff alleges a FMLA retaliation claim

---

to allow an employee, as a condition of continued employment, to enter a supervised rehabilitation program in lieu of termination, a "written conditional reinstatement agreement" is required. (See FD's Ex. E [203-4], at 5.) The parties have pointed the Court to no such written agreement here.

[79] For example, Ms. Scoggins testified that it was her understanding that Mr. Stuenkel wanted her to stay at Ridgeview for its outpatient residential program. (Scoggins Dep. [186] 139.) However, as noted above, she did not want to do so. Thus, when she left Ridgeview, Ms. Scoggins did not inform Mr. Stuenkel or Dr. Biuso that she had done so. (FDSMF ¶ 125.)

without direct evidence of the employer's retaliatory intent, courts apply the McDonnell Douglas burden-shifting framework. Hurlbert, 439 F.3d at 1297. To establish a prima facie case of FMLA retaliation under that framework, the plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. Id. If the plaintiff establishes a prima facie retaliation case, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. Id. If the defendant provides such a reason, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual. Id. To establish a FMLA retaliation claim, the plaintiff must show that the employer's actions were motivated by an "impermissible retaliatory or discriminatory animus." Strickland, 239 F.3d at 1207.

Floyd disputes only plaintiff's inability to establish a causal connection between her protected activity and the adverse employment action. Floyd argues that Mr. Stuenkel did not consider the FMLA when he terminated Ms. Scoggins, that he was unfamiliar with that statute, and that he understood "all of those things would be worked out by human resources after Scoggins received the care she needed on an immediate basis." (FD's Br. [201] 25; FD's Br. [223] 4.) However, there is a fact dispute over whether Mr. Stuenkel considered the FMLA

when he terminated plaintiff. Indeed, his email to Ms. Bradford shows that the FMLA came up during the conversation in which he terminated plaintiff. While Mr. Stuenkel may have been ignorant of the FMLA's requirements, that is no excuse for allegedly violating it.

Therefore, the undersigned reports that plaintiff has established a prima facie FMLA retaliation claim. The undersigned further reports that Floyd has articulated legitimate, non-retaliatory reasons for the discharge—plaintiff's alleged insubordination, failure to communicate, and/or failure to complete the agreed treatment plan (whatever its terms were). Plaintiff has raised a triable issue over whether those reasons were pretextual. For example, plaintiff may not have been insubordinate, as Mr. Stuenkel may not have told her how long she had to stay at Ridgeview. Moreover, plaintiff has submitted evidence that Mr. Stuenkel did not fire her until after she raised the issue of FMLA and he found out she was going to outpatient treatment at Floyd Behavioral Health, which he considered inappropriate. Given the disputed material facts on the FMLA retaliation claim (Count II), the undersigned **RECOMMENDS** that plaintiff's Motion for Summary Judgment on this claim be **DENIED**, and that Floyd's Motion for Summary Judgment on this claim also be **DENIED**.[80]

---

[80] Floyd asserts that it would make no sense for it to learn of Ms. Scoggins's addiction and allow her to leave for treatment, only to terminate her in

### 3.    Plaintiff's Title VII Claim (Count VII)

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  Under that statute, the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her.  Green v. Sch. Bd. of Hillsborough Cty., Fla., 25 F.3d 974, 978 (11th Cir. 1994).  In the absence of direct evidence, a plaintiff can carry this burden by producing circumstantial evidence sufficient to allow an inference of discrimination using the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam).

Under this framework, the plaintiff must first establish a prima facie case of sex discrimination.  One method a plaintiff can use to do so is to show that she (1) was a member of a protected class; (2) was subjected to an adverse employment action; (3) was qualified to do the job; and (4) was replaced or otherwise lost a position to a person outside the protected class.  Chapman v. AI

---

retaliation a week later.  (FD's Br. [248] 13.)  That may be true, and the jury may accept that assertion; however, things that make no sense do happen.

Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). Alternatively, the fourth element may be satisfied if a plaintiff shows that she was treated less favorably than similarly situated employees outside the protected class. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).[81]

If the plaintiff establishes a prima facie case, then the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. Chapman, 229 F.3d at 1024. If the defendant employer articulates one or more legitimate, nondiscriminatory reasons for the challenged employment action, the presumption of discrimination is eliminated. The plaintiff then has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. Chapman, 229 F.3d at 1024; see also Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (to establish pretext, a plaintiff "must demonstrate that the

---

[81] With regard to this element of the prima facie case, the plaintiff and the employee she identifies as a comparator must be similarly situated "in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam). The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer. See Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).

proffered reason was not the true reason for the employment decision") (internal quotation marks omitted).

Plaintiff seeks to establish the fourth element of her prima facie case by pointing to three similarly situated male employees who she claims were treated more favorably than her.  (Pl.'s Br. [190-1] 20; Pl.'s Br. [253] 12.)  However, as summarized <u>supra</u>, Floyd treated plaintiff and the three males exactly the same. All four were confronted about addiction and given the choice of inpatient treatment or termination.  The only difference is that the three males completed the treatment that Floyd demanded and were allowed to return to work, whereas Ms. Scoggins did not complete it and was not allowed to return to work.  Plaintiff obviously disagrees with the legality of Floyd's demand, but the record shows that the demand was made equally to men and women alike.

Because plaintiff has failed to establish a prima facie case, entry of summary judgment against her is warranted.  <u>See</u> <u>Morris v. Emory Clinic, Inc.</u>, 402 F.3d 1076, 1082 (11th Cir. 2005) (per curiam) ("<u>McDonnell Douglas</u> requires the plaintiff to establish a prima facie case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class . . . Only after the plaintiff has made his prima facie case does the burden shift to the defendant."); <u>Turlington v. Atlanta Gas Light Co.</u>, 135 F.3d 1428, 1433 (11th Cir. 1998) ("summary judgment against the

plaintiff is appropriate if he fails to satisfy any one of the elements of a *prima facie* case"). Therefore, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment on her Title VII Claim (Count VII) be **DENIED**, and that Floyd's Motion for Summary Judgment on her Title VII claim be **GRANTED**.

### 4.   Floyd's Affirmative Defenses to Damages

Floyd argues that plaintiff's potential damages under her federal civil rights claims are limited by the after-acquired evidence rule (FD's Br. [201] 38-40), and her failure to mitigate (id. at 40-41). The Court considers these arguments separately below.

### a)   After-Acquired Evidence

In McKennon v. Nashville Banner Publishing Co., 513 U.S. 352 (1995), the Supreme Court addressed how courts are to handle evidence of an employee's wrongdoing in an age discrimination case that is not revealed until after her discharge, also called "after-acquired evidence." The "Court held that after-acquired evidence of wrongful conduct during employment that would have resulted in termination does not 'operate[], in every instance, to bar all relief['] . . . [Instead,] 'the after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered.'" Wallace v. Dunn Constr. Co., 62 F.3d 374, 378 (11th Cir. 1995) (en banc) (quoting McKennon, 513 U.S. at 358-59).

To utilize the after-acquired evidence defense, a defendant must establish "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." McKennon, 513 U.S. at 362-63. A defendant therefore must prove the following three elements: (1) a wrongdoing (2) of such severity (3) that the employer would have terminated the plaintiff had it known of the misconduct prior to the actual discharge. Id. Once a defendant prevails on this defense, the plaintiff is precluded "as a general rule" from recovering front pay or being reinstated. Id. at 361-62. Also, the plaintiff may only recover backpay "from the date of the unlawful discharge to the date the new information was discovered." Id. at 362.

In Wallace, the Eleventh Circuit extended McKennon's after-acquired evidence rule to Title VII and Equal Pay Act cases in which the "after-acquired evidence concerns the employee's misrepresentations in a job application or resume." 62 F.3d at 379-80 (finding employee barred from receiving reinstatement, front pay, and injunctive relief because the evidence showed that she lied on her employment application about a prior criminal record, and the employer showed that it would have fired her upon learning of that lie; backpay

remedy limited).[82]   When an employee makes a misrepresentation in a job application or resume, the Circuit held that "'the pertinent inquiry . . . is whether the employee would have been fired upon discovery of the wrongdoing, not whether he would have been hired in the first instance.'" Id. at 379 n.8 (quoting Shattuck v. Kinetic Concepts, Inc., 49 F.3d 1106, 1108 (5th Cir. 1995)).[83]

Floyd asserts that it would have fired Ms. Scoggins upon discovery of her drug addiction, given that narcotics abuse is listed as a terminable offense under the Employment Agreement and violates Floyd's Alcohol and Drug Policy. (FD's Br. [201] 39.)  Floyd contends that plaintiff admitted her wrongdoing at her deposition on September 18, 2015; thus, her claim for back pay is limited to the period from her termination date (March 21, 2014) to September 18, 2015.  (Id. at 40.)  Plaintiff responds that Floyd cannot satisfy its burden to assert the after-acquired evidence defense because it learned of her drug addiction when she admitted it during the boardroom meeting, and instead of firing her, placed her on

---

[82] Plaintiff's argument that the after-acquired evidence rule is irrelevant at the summary judgment stage (Pl.'s Br. [228] 33-34) is incorrect.  "[T]he Eleventh Circuit sitting en banc in Dunn . . . explicitly reviewed the after-acquired evidence defense following disposition of the defense on a summary judgment motion."  Haines v. Cherokee Cty., No. 1:08-CV-2916-JOF/AJB, 2010 WL 2821853, at *30 (N.D. Ga. Feb. 16, 2010), R. & R. adopted as modified, No. 1:08-CV-02916-JOF, 2010 WL 2821780 (N.D. Ga. July 15, 2010).

[83] Given the holding in Wallace, Floyd's argument that it would not have hired Ms. Scoggins had it known of her drug addiction is immaterial. Accordingly, the Court excludes FDSMF ¶ 38.

FMLA leave and sent her to treatment.  (Pl.'s Br. [228] 35.)  Given that Floyd did

not fire the three males mentioned above when it discovered their drug and/or

alcohol addiction, she adds that Floyd cannot in good faith argue that it would

have fired only her.  (Id. at 35-36.)  Floyd replies that its showing of goodwill in

sending plaintiff to treatment instead of immediately firing her should not bar it

from relying on the after-acquired evidence doctrine.  (FD's Br. [248] 19.)  Floyd

argues that plaintiff's position would require employers to "fire first and think

later" instead of offering rehabilitation so as to avoid waiver of the after-acquired

evidence doctrine, which would be bad public policy and harm employees like

Ms. Scoggins.  (Id. at 19-20.)

The undisputed facts show that Ms. Scoggins admitted to Floyd that she

had an addiction to prescription drugs during the March 2014 boardroom meeting.

The September 2015 deposition confirmed what Floyd already knew (although it

did learn more about when the addiction began and its extent).  In other words,

evidence of plaintiff's drug addiction was not acquired after her termination and

during discovery.  See McKennon, 513 U.S. at 356 (describing after-acquired

evidence as the "later discover[y] [of] some wrongful conduct that would have

led to discharge if it had been discovered earlier"); Smith v. Ark. Highway Police,

No. 4:13CV00301 JLH, 2014 WL 4202511, at *13 (E.D. Ark. Aug. 22, 2014)

(because defendants knew of and had investigated the complainant's allegations

against the plaintiff in 2004, and the complainant's current affidavit made no new allegations against him, the affidavit did not constitute after-acquired evidence). Because this evidence of plaintiff's drug addiction was not after acquired, the undersigned **RECOMMENDS** that Floyd's Motion for Summary Judgment on part of any back pay that may be awarded to plaintiff be **DENIED**.

### b)      Failure to Mitigate Damages

"The purpose of relief under the federal employment anti-discrimination laws is to make persons whole for injuries suffered on account of unlawful employment discrimination."   U.S. E.E.O.C. v. Massey Yardley Chrysler Plymouth. Inc., 117 F.3d 1244, 1251 (11th Cir. 1997) (internal quotation marks and citation omitted).  The plaintiff has a duty to mitigate her damages by being reasonably diligent in seeking substantially equivalent employment.  Id.   The burden is on the employer to prove the plaintiff lacked diligence.  Id. at 1252. "Substantially equivalent" means employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status compared to the job from which the plaintiff was terminated.  Perez v. Sprint/United Mgmt. Co., No. 1:12-CV-3161-MHS, 2013 WL 6970898, at *12 (N.D. Ga. Dec. 19, 2013).

Floyd argues that plaintiff has failed to present any evidence that she has made an effort to obtain employment comparable to the position she held with it.

Floyd points to the absence in the record of a single application, email, resume, or letter of interest to one or more hospitals inside or outside of Georgia reflecting an attempt by plaintiff to become fully employed; instead, the record shows that she works part time at $35 per hour with benefits.  (FD's Br. [201] 40-41.)  Ms. Scoggins responds that she did produce documents related to the job search she was required to conduct in order to receive unemployment compensation (Pl.'s Br. [228] 38 n.15), and that she testified that she applied for jobs and talked to many people about jobs in the nursing profession (id. at 38).

In this situation, the undersigned finds the conclusion reached by former Chief Judge Evans instructive:

> The Court does not find it appropriate at this time to rule on whether any backpay award to Ms. [Scoggins] should be reduced for failure to mitigate damages.  As noted above, Ms. [Scoggins's] entitlement to backpay has not been established.  Furthermore, on the evidence available, the Court can not say that Ms. [Scoggins] post-discharge employment decisions were so unreasonable that her recovery of damages should be reduced.  Accordingly, the Court declines to grant [defendant] summary judgment on this issue.

Rogers v. Addison-Wesley Pub. Co., 99 F.R.D. 85, 88 (N.D. Ga. 1983).

The undersigned **RECOMMENDS** that Floyd's Motion for Summary Judgment seeking to deny backpay to plaintiff over her claimed failure to mitigate

damages be **DENIED**.[84]  See Knox v. Cessna Aircraft Co., No. 4:05-CV-131(HL), 2007 WL 2874228, at *12 (M.D. Ga. Sept. 26, 2007) ("Whether a plaintiff acted reasonably to mitigate his damages is typically a question of fact for the jury, and this Court cannot say that Plaintiff acted unreasonably as a matter of law. Accordingly, Defendant's Motion for Summary Judgment on the issue of Plaintiff's failure to reasonably mitigate damages is denied.").  The jury can be instructed on the law concerning mitigation of damages and can reduce any award if it finds that plaintiff was not reasonably diligent in seeking substantially equivalent employment.

## B.    Plaintiff's State Law Claims

Plaintiff asserts state law claims against all defendants for negligence per se (Count VIII), violation of the statute creating the GPDMP (Count IX), and invasion of privacy/wrongful disclosure (Count XI).  She asserts a state law claim against Floyd only for breach of contract/stubborn litigiousness (Count X).  The Court considers these claims in that order below.

--------

[84] The cases cited by Floyd in its brief [201] address mitigation of damages in claims brought under the federal anti-discrimination laws.  There may be no obligation, however, for plaintiff to mitigate damages on her claim for breach of the Employment Agreement.  See Victory Sign Indus., Ltd. v. Potter, 430 S.E.2d 882, 883 (Ga. Ct. App. 1993).

1.    **Negligence Per Se Against All Defendants (Count VIII)**

Plaintiff asserts claims of negligence per se under O.C.G.A. § 51-1-6[85]

against all of the individual defendants for their alleged intentional breaches of

the so-called "privacy rule" found in regulations promulgated under the Health

Insurance Portability and Accountability Act of 1996 ("HIPAA").  (See Second

Am. Compl. ¶ 145, citing 45 C.F.R. §§ 160 and 164.)[86]  Plaintiff also contends

that Floyd is vicariously liable to her as the employer of the individual defendants

for their multiple disclosures of her protected health information (which she

describes as her diagnosis of addiction, her prescription drug history taken from

---

[85] Section 51-1-6 provides as follows:

> When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby.

O.C.G.A. § 51-1-6.

[86] Although the Second Amended Complaint did not specify which piece of these lengthy HIPAA regulations defendants violated, plaintiff cites in her brief 45 C.F.R. §§ 164.502(a), 164.530(c)(1), and 164.530(c)(2)(ii).  (Pl.'s Br. [190-1] 11-12 & n.7.)  Because there is not private right of action for violation of HIPAA regulations, and the undersigned recommends that no claim for negligence per se be recognized based on alleged HIPAA violations, the Court excludes facts plaintiff proposes about HIPAA as  immaterial.  (See PSMF ¶¶ 54-57.)

the GPDMP database, and her entry into addiction treatment).[87] (Pl.'s Br. [190-1] 21 n.10; see also Pl.'s Br. [253] 13.)

Defendants responds that HIPAA violations do not create a private right of action, see Crawford v. City of Tampa, 397 F. App'x 621, 623 (11th Cir. 2010) (per curiam),[88] and that plaintiff seeks to circumvent this clearly-established law by attempting to disguise a HIPAA claim under the label of a state law negligence per se claim. (FD's Br. [201] 28; see also Biuso's Br. [194] 10; Hardwell's Br. [195] 10; Bouldin's Br. [196] 8-9.) Defendants further assert that, although the

---

[87] Although plaintiff also argues that the defendants injured her by their failure to destroy her protected health information (Pl.'s Br. [190-1] 21), there is no such allegation in the Second Amended Complaint. Thus, the Court does not discuss it, as plaintiff cannot amend her pleadings through a brief. In any event, if the Court construed the Second Amended Complaint as making such a "failure to destroy" claim, it fails for the same reasons that her disclosure of protected health information claim fails.

[88] In Acara v. Banks, 470 F.3d 569 (5th Cir. 2006) (per curiam), relied on in Crawford, 397 F. App'x at 623, the Fifth Circuit stated as follows:

> HIPAA does not contain any express language conferring privacy rights upon a specific class of individuals. Instead, it focuses on regulating persons that have access to individually identifiable medical information and who conduct certain electronic health care transactions. 42 U.S.C. § 1320d-1. HIPAA provides both civil and criminal penalties for improper disclosures of medical information. 42 U.S.C. §§ 1320d-5, d-6. However, HIPAA limits enforcement of the statute to the Secretary of Health and Human Services. Id. Because HIPAA specifically delegates enforcement, there is a strong indication that Congress intended to preclude private enforcement.

Acara, 470 F.3d at 571.

permissibility of allowing the claim alleged here has not been decided under Georgia law, other courts have refused to allow HIPAA to serve as the basis for a negligence per se claim.  (FD's Br. [201] 28, citing L.S. v. Mount Olive Bd. of Ed., 765 F. Supp. 2d 648 (D.N.J. 2011), and Sheldon v. Kettering Health Network, 40 N.E.3d 661 (Ohio Ct. App. 2015).)  Plaintiff does not dispute that there is no private right of action for an alleged HIPAA violation, and she does not try to distinguish Mount Olive Board of Education and Sheldon, but she cites a number of cases which reflect, in her words, "the national trend *toward* recognizing state law negligence per se claims for violation of HIPAA standards." (See, e.g., Pl.'s Br. [228] 26.)

Review of those cases shows, however, that there is no national trend toward recognizing such a claim.  (See, e.g., Bouldin's Br. [236] 4-5.)  Instead, this Court finds persuasive the two cases cited by defendants that are on point. See Mount Olive Bd. of Ed., 765 F. Supp. 2d at 665-66 (dismissing negligence per se claim based on an alleged HIPAA violation); Sheldon, 40 N.E.3d at 674 (refusing to recognize negligence per se claim for alleged HIPAA violation); see also Ruder v. Pequea Valley Sch. Dist., 790 F. Supp. 2d 377, 403 (E.D. Pa. 2011) (even assuming that HIPAA regulations applied to discharged teacher's medical provider, and that provider violated those regulations by providing teacher's supervisor with information regarding authenticity of medical statement that

111

teacher had represented was from provider, HIPAA's purpose was to protect interest of general public, not any one specific group of individuals, and thus HIPAA could not form statutory basis for teacher's negligence per se claim against provider under Pennsylvania law).

The undersigned further notes that this Court has held that a claim for negligence per se under § 51-1-6 fails if the statute or regulation establishing the claimed legal duty does not provide a cause of action for damages for its violation. See Miller v. Chase Home Fin., LLC, No. 2:10-CV-206-WCO, 2011 WL 10944693 (N.D. Ga. Oct. 6, 2011), aff'd, 677 F.3d 1113 (11th Cir. 2012). In Miller, the plaintiff sought leave to amend the complaint to add a claim for negligent implementation of the Home Affordable Modification Program ("HAMP"). 2011 WL 10944693, at *5. He cited as supporting authority Speleos v. BAC Home Loans Servicing, L.P., 755 F. Supp. 2d 304 (D. Mass. 2012). Miller, 2011 WL 10944693, at *5. This Court distinguished Speleos because, although no private cause of action exists under HAMP, an individual could still pursue a claim under Massachusetts law for negligence per se based on an alleged statutory or regulatory violation. Miller, 2011 WL 10944693, at *6. The rule is not the same in this State, as this Court has made clear:

> In Georgia, "it is well settled that violating statutes and regulations does not automatically give rise to a civil cause of action by an individual claiming to have been injured from a violation thereof." Govea v. City of Norcross, 271 Ga. App. 36, 41, 608 S.E.2d 677

(2004).  The <u>Govea</u> court held that, where the statute that allegedly was violated did not provide a cause of action for damages, the plaintiff could not recover damages based on a negligence theory.[89] <u>See also</u> <u>Northrup v. Conseco Fin. Corp.</u>, 141 F. Supp. 2d 1372, 1376 (M.D. Ga. 2001) (interpreting [§ 51-1-6] and holding that there can be no "private cause of action unless the statutes outlining the legal duty provide for a civil remedy.") [, <u>aff'd</u>, 281 F.3d 1285 (11th Cir. 2001) (table decision)].

<u>Id.</u>  Because HAMP did not provide that plaintiff with a private cause of action, this Court denied as futile his proposed amendment to add a claim for negligence <u>per</u> <u>se</u>.  <u>Id.</u>

Thus, under <u>Miller</u> and <u>Govea</u>, a plaintiff may not pursue a claim of negligence <u>per</u> <u>se</u> under § 51-1-6 if the statute or regulation reportedly giving rise to the legal duty does not provide a civil remedy.  As discussed <u>supra</u>, HIPAA does not provide a civil remedy.  Accordingly, Ms. Scoggins cannot pursue claims of negligence <u>per</u> <u>se</u> against these defendants for an alleged HIPAA violation.  Therefore, the undersigned **RECOMMENDS** that plaintiff's Motion for Summary Judgment on her negligence <u>per</u> <u>se</u> claim (Count VIII) be **DENIED**,

---

[89] Defendants argue that <u>Govea</u> bars plaintiff's negligence <u>per</u> <u>se</u> claim. (<u>See, e.g.</u>, Hardwell's Br. [195] 10-12.)  Plaintiff responds that <u>Govea</u> is distinguishable because it does not mention § 51-1-6.  (<u>See</u> Pl.'s Br. [211] 13.) While that statute is not mentioned, it is clear that those plaintiffs made a claim under § 51-1-6, because they argued that the City of Norcross was negligent <u>per</u> <u>se</u> in violating the POST statutes and regulations.  <u>See</u> <u>Govea</u>, 608 S.E.2d at 683 ("Consequently, even assuming, without deciding, that Norcross failed to meet its reporting duties pursuant to POST statutes and regulations, [the parents] cannot recover damages based on their asserted theory of negligence per se.").

and that the Motions for Summary Judgment filed by the defendant doctors and the Floyd defendants against plaintiff's negligence per se claim (Count VIII) be **GRANTED**.

## 2. <u>Violation of GPDMP Against All Defendants (Count IX)</u>

In 2011, the General Assembly charged the Georgia Drugs and Narcotics Agency (the "Agency"), in consultation with the Georgia Composite Medical Board (the "Board"), to "establish and maintain a program to electronically record into an electronic data base prescription information resulting from the dispensing of Schedule II, III, IV, or V controlled substances and to electronically review such prescription information that has been entered into such data base." O.C.G.A. § 16-13-57(a). The purpose of the Act creating the GPDMP was "to assist in the reduction of the abuse of controlled substances, to improve, enhance, and encourage a better quality of health care by promoting the proper use of medications to treat pain and terminal illness, and to reduce duplicative prescribing and overprescribing of controlled substance practices." Id.

To create this database, each "dispenser" is required to submit to the Agency "by electronic means information regarding each prescription dispensed for a Schedule II, III, IV, or V controlled substance." O.C.G.A § 16-13-59(a). With exceptions that are inapplicable here, "prescription information submitted pursuant to Code Section 16-13-59 shall be confidential and shall not be subject

to open records requirements." Id. § 16-13-60(a).  The Act directs the Agency, in conjunction with the Board, to establish and maintain strict procedures to ensure that the privacy and confidentiality of patients, prescribers, and patient and prescriber information collected, recorded, transmitted, and maintained pursuant to this part are protected.  Id. § 16-13-60(b).  Moreover, the Agency may not disclose such information "to any person or entity except as specifically provided in this part and only in a manner which in no way conflicts with the requirements of the federal Health Insurance Portability and Accountability Act (HIPAA) of 1996, P.L. 104-191." Id.

Under the Act, as is relevant here, the Agency is authorized to provide requested prescription information that it has collected only:

(1)    To persons authorized to prescribe or dispense controlled substances for the sole purpose of providing medical or pharmaceutical care to a specific patient;[90]

(2)    Upon the request of a patient, prescriber, or dispenser about whom the prescription information requested concerns . . . .

O.C.G.A § 16-13-60(c)(1), (2).  The Act also restricts what the recipient of electronic data base prescription information from the Agency may do with it:

---

[90] A "patient" is defined as "the person who is the intended consumer of a drug for whom a prescription is issued or for whom a drug is dispensed." O.C.G.A. § 16-13-21(19.1).

> Any person or entity who receives electronic data base prescription information or related reports relating to this part **from the agency** shall not provide such information or reports to any other person or entity except by order of a court of competent jurisdiction pursuant to this part.

Id. § 16-13-60(e) (emphasis added).

The Act creating the GPDMP contains criminal penalties for (1) a dispenser who knowingly and intentionally fails to submit prescription information to the Agency, see O.C.G.A. § 16-13-64(a); (2) an "individual authorized to access electronic data base prescription information pursuant to this part who negligently uses, releases, or discloses such information in a manner or for a purpose in violation of this part," id. § 16-13-64(b); (3) an "individual authorized to access electronic data base prescription information pursuant to this part who knowingly obtains or discloses such information in a manner or for a purpose in violation of this part," id. § 16-13-64(c)(1); (4) "[a]ny person who knowingly obtains, attempts to obtain, or discloses electronic data base prescription information pursuant to this part under false pretenses," id. § 16-13-64(c)(2); and (5) "[a]ny person who obtains or discloses electronic data base prescription information not specifically authorized herein with the intent to sell, transfer, or use such information for commercial advantage, personal gain, or malicious harm," id. § 16-13-64(c)(3).

The Act creating the GPDMP also provides for a private right of action for damages:

> Any person who is injured by reason of any violation of this part shall have a cause of action for the actual damages sustained and, where appropriate, punitive damages. Such person may also recover attorney's fees in the trial and appellate courts and the costs of investigation and litigation reasonably incurred.

O.C.G.A. § 16-13-64(d). Plaintiff is proceeding under this section against all defendants. (See Second Am. Compl. Count IX, ¶¶ 152-56.)[91]

As already discussed, Dr. Bouldin accessed the GPDMP database and printed Ms. Scoggins's prescription drug history. Plaintiff agrees that Dr. Bouldin was authorized to do so under O.C.G.A § 16-13-60(c)(1). (Pl.'s Br. [190-1] 21 n.11.) She argues, however, that Dr. Bouldin violated § 16-13-60(e) by sharing the printout with Dr. Hardwell. (Id. at 22; see also Pl.'s Br. [212] 15-16.) Dr. Bouldin responds that the statute cannot be read literally given the absurd results that can be imagined.[92] Thus, he argues that this Court should

---

[91] The General Assembly amended the Act creating the GPDMP during the 2016 session. See 2016 Ga. Laws 354. However, those provisions will not go into effect until July 1 of this year. The Court thus rejects defendants' suggestions that the statute be interpreted in light of those amendments. (See Bouldin's Br. [236] 11-12.)

[92] The defendant doctors assert that a literal reading of § 16-13-60(e) prohibits: (1) a doctor who discovers that his patient is receiving narcotics from himself and others from coordinating prescriptions among treating physicians; (2) a doctor from advising his own patient that the patient's records indicate abuse;

devise a non-absurd interpretation of the Act by applying the standards governing protected health information under HIPAA to prescription information that is protected under the GPDMP. (DD's Br. [217] 14-16; see also Bouldin's Br. [196] 13-17.)

There are no reported court decisions interpreting the Act creating the GPDMP. Although defendants argue that this Court must construe the statute in a way that avoids an unreasonable result unintended by the Legislature, see Cardinale v. City of Atlanta, 722 S.E.2d 732, 735 (Ga. 2012), a court must

> apply the fundamental rules of statutory construction that require us to construe a statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage. At the same time, we must seek to effectuate the intent of the legislature.

Slakman v. Cont'l Cas. Co., 587 S.E.2d 24, 26 (Ga. 2003) (citations omitted). "Furthermore, '[w]here the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden.'" Colon v. Fulton Cty., 751 S.E.2d 307, 310 (Ga. 2013) (quoting Six Flags Over Ga. v. Kull, 576

_____

(3) a doctor telling a replacement doctor at shift change about a patient's history of prescription abuse; (4) a patient, who obtains her own GPDMP records, from disclosing those records to her physicians; (5) a patient from consenting to a doctor to share her GPDMP records with a consulting physician; (6) a pharmacist from telling her staff not to fill a prescription for a patient whose GPDMP records reflect prescription abuse; or (7) disclosures from authorized recipients to counsel. (DD's Br. [217] 15-16.) They argue that these prohibited disclosures are consistent with the purpose of the GPDMP as outlined in § 16-13-57(a).

S.E.2d 880, 881 (Ga. 2003); <u>see also</u> <u>Cook v. NC Two, L.P.</u>, 712 S.E.2d 831, 834 (Ga. 2011) (rules of statutory construction are not applicable when the statute is plain and unambiguous and susceptible to but one natural and reasonable construction since judicial construction of such a statute is unauthorized). "[U]nder our system of separation of powers this Court does not have the authority to rewrite statutes." <u>State v. Fielden</u>, 629 S.E.2d 252, 257 (Ga. 2006). "When we read the statutory text, 'we must presume that the General Assembly meant what it said and said what it meant.'" <u>Tibbles v. Teachers Ret. Sys. of Ga.</u>, 775 S.E.2d 527, 529 (Ga. 2015) (quoting <u>Deal v. Coleman</u>, 751 S.E.2d 337, 341 (Ga. 2013). A court cannot reject the plain language of a statute unless it will lead to unreasonable consequences or absurd results not contemplated by the Legislature. <u>Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa</u>, 620 S.E.2d 352, 355 (Ga. 2005).

Given the above guidelines, the undersigned is constrained to apply the statute's literal terms. <u>See</u> <u>Judicial Council of Ga. v. Brown & Gallo, LLC</u>, 702 S.E.2d 894, 897 (Ga. 2010) ("[T]he golden rule of statutory construction . . . requires us to follow the literal language of the statute unless it produces contradiction, absurdity, or such an inconvenience as to insure that the legislature meant something else.") (internal quotation marks omitted). Despite defendants' arguments (<u>see supra</u> note 92), the Court cannot find that the literal language of

the statue produces contradiction, absurdity, or such an inconvenience as to insure that the legislature meant something else. Because of differences in the analysis, the Court considers Dr. Bouldin separately from the other individual defendants.

### a)    **Dr. Bouldin**

According to O.C.G.A. § 16-13-60(e), any person or entity who receives electronic data base prescription information or related reports relating to this part "from the agency" shall not provide such information or reports to any other person or entity except by order of a court of competent jurisdiction. Dr. Bouldin received electronic data base prescription information about plaintiff from the Agency. This statute mandates that he not provide that electronic data base prescription information to any other person or entity except by order of a court. Because Dr. Bouldin provided the printout of plaintiff's prescription drug history that he had received from the Agency to Dr. Hardwell, he violated the statute.

However, the undersigned cannot recommend entry of summary judgment for plaintiff on liability under § 16-13-60(e) because Dr. Bouldin asserts three affirmative defenses: (1) consent; (2) immunity for voluntary health care providers; and (3) unclean hands. (See Bouldin's Br. [196] 21-23.) Because the

material facts regarding these affirmative defenses are disputed,[93] the District Court may elect to charge the jury on one or more of them, which are discussed separately below.

### (1)   Consent

Dr. Bouldin notes that plaintiff consented to forming the doctor-patient relationship with him. Dr. Bouldin argues that, when he acted within the scope of that relationship by consulting with Dr. Hardwell and sharing with him the printout from the GPDMP database, Ms. Scoggins impliedly consented to that as well. (Bouldin's Br. [196] 21.)[94] Plaintiff responds that Dr. Bouldin's disclosure of confidential information from the GPDMP database exceeded the scope of any consent that arose out of their relationship, and that she did not consent to formation of a physician-patient relationship with Dr. Hardwell. (Pl.'s Br. [212] 21-22.)

---

[93] These same disputed material facts also prevent the undersigned from recommending entry of summary judgment for Dr. Bouldin on one of more of these affirmative defenses.

[94] Dr. Bouldin bases this affirmative defense on Georgia's consent statute: "As a general rule no tort can be committed against a person consenting thereto if that consent is free, is not obtained by fraud, and is the action of a sound mind." O.C.G.A. § 51-11-2.

The parties have not cited, and the Court's research has not found, cases directly on point with their arguments.[95]  A physician-patient relationship may be implied.  See Rindsberg v. Neacsu, 730 S.E.2d 525, 528 (Ga. Ct. App. 2012); Anderson v. Houser, 523 S.E.2d 342, 346-47 (Ga. Ct. App. 1999); see also Irvin v. Smith, 31 P.3d 934, 941 (Kan. 2001).  However, these are medical malpractice cases where the plaintiff had to show physician-patient privity in order to establish a legal duty to conform to a standard of conduct.  See Bradley Ctr., Inc. v. Wessner, 296 S.E.2d 693, 695 (Ga. 1982).  Because these courts assumed consent from the plaintiff-patient, the focus was on whether the physician consented to be the plaintiff's doctor.  See Anderson, 523 S.E.2d at 347 ("the key question in determining the existence of a doctor-patient relationship is whether the physician has knowingly accepted such individual as his patient").  The same issue arises with a consulting physician.  For example, in Schrader v. Kohout, 522 S.E.2d 19, 21 (Ga. Ct. App. 1999), a consulting physician argued that he did not consent to creation of a physician-patient relationship.  The court agreed and dismissed the malpractice claim for lack of a physician-patient relationship.  Id.

The instant case presents the opposite scenario, where the defendant doctors argue that the physician-patient relationship should be implied between

---

[95] The case Dr. Bouldin cites, Teems v. Bates, 684 S.E.2d 662 (Ga. Ct. App. 2009), discussed consent in the context of assumption of risk.

122

Ms. Scoggins and the consulting physician (Dr. Hardwell) [96] and where the plaintiff argues that it should not. Given the factual dispute over whether Ms. Scoggins impliedly consented to creation of a physician-patient relationship with Dr. Hardwell when Dr. Bouldin "consulted" with him over her addiction and shared the GPDMP printout, it is for the District Court to determine whether this affirmative defense may be presented to the jury.

### (2)    <u>Voluntary Health Care Provider Immunity</u>

The immunity statute for voluntary health care providers states in relevant part as follows:

> Without waiving or affecting and cumulative of any existing immunity from any source, unless it is established that injuries or death were caused by gross negligence or willful or wanton misconduct:
>
> (1)    No health care provider . . . who voluntarily and without the expectation or receipt of compensation provides professional services . . . ., for and at the request of a hospital . . . , which [hospital] does not expect or receive compensation with respect to such services from the recipient of such services; or
>
> (2)    No licensed hospital . . . which requests, sponsors, or participates in the providing of the services under the circumstances provided in paragraph (1) of this subsection
>
> shall be liable for damages or injuries alleged to have been sustained by the person nor for damages for the injury or death of the person

---

[96] The parties dispute whether Dr. Bouldin needed a consult with Dr. Hardwell, and whether the meeting between them was a consult or Dr. Bouldin reporting information about a high-level administrator to his supervisor.

when the injuries or death are alleged to have occurred by reason of an act or omission in the rendering of such services.

O.C.G.A. § 51-1-29.1(a).[97]

Dr. Bouldin argues that he never billed plaintiff for his services, and that his actions were approved by his superiors, thus entitling him to immunity under the above-quoted statute. (Bouldin's Br. [196] 22.) Plaintiff responds that, assuming that Dr. Bouldin's disclosure of the GPDMP printout was medical treatment, Floyd never requested that he treat plaintiff for free. (Pl.'s Br. [212] 23.) Dr. Bouldin replies that requiring a prior request from a hospital is an unduly restrictive reading of the statute, and that Mr. Stuenkel expressly ratified Dr. Bouldin's actions. (Bouldin's Br. [236] 14.)

It is undisputed that plaintiff did not pay Dr. Bouldin for his professional services. Although Floyd did not request that Dr. Bouldin treat plaintiff for free, it appears that it was the custom at Floyd for its doctors to dispense free services to Floyd employees, and Mr. Stuenkel (on behalf of Floyd) arguably ratified what Dr. Bouldin did. However, given the disputed issues of material fact, it is for the

---

[97] The parties mistakenly refer to this code section as the Good Samaritan statute. However, the Good Samaritan statute is codified at O.C.G.A. § 51-1-29. See Reid v. Midwest Transp., 607 S.E.2d 170, 173-74 (Ga. Ct. App. 2004) (labeling § 51-1-29 as the "the Good Samaritan Statute"). This error resulted in plaintiff responding to defendant's argument with inapposite case law. (See Pl.'s Br. [212] 22-23.)

District Court to determine whether this affirmative defense may be presented to the jury.

### (3)    <u>Unclean Hands</u>

"To assert an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing." <u>Bailey v. TitleMax of Ga., Inc.</u>, 776 F.3d 797, 801 (11th Cir. 2015).  Although plaintiff argues that her disability is not wrongdoing (Pl.'s Br. [212] 23), as discussed <u>supra</u>, her addiction to prescription drugs is not a disability.  Moreover, it is accurate to say that, had plaintiff not wrongfully sought Ambien from Dr. Bouldin, he would not have pulled her GPDMP record and then shared it with Dr. Hardwell.  Given the disputed issues of material fact, it is for the District Court to determine whether this affirmative defense may be presented to the jury.

In summary, there is a triable issue on whether Dr. Bouldin is liable to plaintiff for violating the Act creating the GPDMP.  However, the District Court may allow this individual defendant to assert one or more of the aforementioned affirmative defenses to the jury should the evidence support it.  Moreover, defendant Floyd remains a defendant to this claim via *respondeat superior*. Therefore, plaintiff's Motion for Summary Judgment on her GPDMP claim should be **DENIED**, Dr. Bouldin's Motion for Summary Judgment against

plaintiff's GPDMP claim should be **DENIED**, and Floyd's Motion for Summary Judgment against plaintiff's GPDMP claim should be **DENIED**.

### b)    Dr. Hardwell, Dr. Biuso, and Mr. Stuenkel

The plain language of § 16-13-60(e) means that Dr. Hardwell, Dr. Biuso, and Mr. Stuenkel have no liability under that statute creating the GPDMP. This is because they did not receive electronic database prescription drug information from the Agency. Instead, Dr. Hardwell received it from Dr. Bouldin; Dr. Biuso received it from Dr. Hardwell; and Mr. Stuenkel received it from Dr. Biuso.[98] Therefore, plaintiff's Motion for Summary Judgment against Dr. Hardwell, Dr. Biuso, and Mr. Stuenkel on her claim that they violated the statute creating the GPDMP (Count IX) should be **DENIED**, and the Motions for Summary Judgment filed by Dr. Hardwell, Dr. Biuso, and Mr. Stuenkel against plaintiff's claim that they violated the statute creating the GPDMP should be **GRANTED**.

### 3.    Invasion of Privacy Against All Defendants (Count XI)

"Under current Georgia law, the concept of invasion of privacy encompasses four loosely related but distinct torts." Summers v. Bailey, 55 F.3d 1564, 1566 (11th Cir. 1995). They are as follows: (1) intrusion upon the

---

[98] There is no evidence that Mr. Stuenkel reviewed the GPDMP database printout, but Dr. Biuso told him that it reflected plaintiff was addicted to prescription drugs. Assuming that this was receipt of electronic data base prescription information, it is immaterial because Mr. Stuenkel did not receive it from the Agency. He received it from Dr. Biuso.

plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation for the defendant's advantage, of the plaintiff's name or likeness.  Yarbray v. S. Bell Tel. & Tel. Co., 409 S.E.2d 835, 836 (Ga. Ct. App. 1991) (attributing these four elements to Cabaniss v. Hipsley, 151 S.E.2d 496, 500 (Ga. Ct. App. 1966)).  Given the allegations of the Second Amended Complaint (¶ 162) and Ms. Scoggins's primary brief ([190-1] 25),[99] plaintiff asserts the first two of these invasion of privacy torts, which the Court addresses in turn below.

### a)    Intrusion Upon Seclusion

The "tort of intrusion involves an unreasonable and highly offensive intrusion upon another's seclusion."  Summers, 55 F.3d at 1566.  In discussing this tort, the Circuit stated that

> Georgia courts have long recognized the form of invasion consisting of intrusion upon physical solitude or seclusion analogous to a trespass in plaintiff's home or other quarters, such as hospital or hotel rooms.  Georgia courts have extended the principle beyond physical intrusion to include prying and intrusions into private

---

[99] In her response to Dr. Bouldin's Motion for Summary Judgment, plaintiff mentions in passing a "false light" invasion of privacy claim.  (See Pl.'s Br. [212] 18.)  However, the Court will not allow plaintiff to amend her Complaint via a brief.  Moreover, there is no evidence that Dr. Bouldin placed "the plaintiff in a false light in the public eye."  Cabaniss, 151 S.E.2d at 502.  First, nothing he said was false.  She was an addict.  Second, as discussed in detail infra, Dr. Bouldin did not disclose anything to the public.

concerns, such as eavesdropping by microphone and peering into the windows of a home.

Id.; see also Anderson v. Mergenhagen, 642 S.E.2d 105, 109 (Ga. Ct. App. 2007) (stating that while earlier Georgia cases concluded that an intrusion must be physical, analogous to a trespass, "concurrent cases have recognized that this 'physical' requirement can be met by showing that the defendant conducted surveillance on the plaintiff or otherwise monitored her activities").

In Benedict v. State Farm Bank, FSB, 709 S.E.2d 314 (Ga. Ct. App. 2011), the court provided the following summary of this tort:

> More than 100 years ago, our Supreme Court recognized a private right of action for an invasion of privacy. Since then, the Supreme Court and this Court have identified four kinds of invasion of privacy for which a right of action exists, and among these is an intrusion upon the seclusion or solitude of a plaintiff or into his private affairs.
>
> . . .
>
> The Supreme Court has instructed that conduct actionable as an intrusion "involves a prying or intrusion, which would be offensive or objectionable to a reasonable person, into a person's private concerns," but a more precise definition of such a prying or intrusion remains somewhat elusive. For several years, our Court said that, "to state a claim under the 'unreasonable intrusion' tort, the plaintiff must allege a physical intrusion which is analogous to trespass." In more recent cases, we have adhered to the requirement of a "physical intrusion," but with the understanding "that this 'physical' requirement can be met by showing that the defendant conducted surveillance on the plaintiff or otherwise monitored her activities." Benedict does not allege, however, that State Farm made any "physical intrusion which is analogous to trespass" or that State

> Farm "conducted surveillance on [Benedict] or otherwise monitored [his] activities."
>
> Benedict instead alleges only that State Farm representatives placed repeated calls to his telephone number, not for any legitimate business purpose, but merely to harass, bother, and annoy him. We do not doubt that such a pattern of conduct may be a substantial annoyance to the recipient of the calls and may disturb his peace and tranquility. But Benedict does not point us to any case—and we have not found any case—in which the Supreme Court or our Court has held that merely annoying someone or disturbing his peace or tranquility, without more, amounts to an actionable invasion of privacy. To the contrary, the cases in which we have found actionable intrusions involved visual surveillance of a plaintiff as she was engaged in her private affairs, electronic surveillance of a plaintiff while she was in private places, physical trespasses upon private property, or an unwanted, physical touching of the plaintiff. Because Benedict does not allege any conduct that is akin to surveillance, a physical trespass upon his property, or a physical touching of his person, we must conclude that Benedict fails to state a claim upon which relief can be granted under any of our intrusion precedents.

Id. at 317-18 (citations and footnote omitted).

Similarly, the undisputed material facts here fail to show any conduct by defendants that is akin to surveillance, a physical trespass upon Ms. Scoggins's property, or a physical touching of her person; therefore, the undersigned **REPORTS** that plaintiff has failed to establish the intrusion upon seclusion tort, and thus **RECOMMENDS** that plaintiff's Motion for Summary Judgment on this part of her invasion of privacy claim be **DENIED**, and that the Motions for Summary Judgment filed by the Floyd defendants and the defendant doctors on this part of plaintiff's invasion of privacy claim be **GRANTED**.

129

### b)    <u>Public Disclosure</u>

A claim for disclosure of embarrassing private facts requires that (a) the disclosure of private facts must be a public disclosure; (b) the facts disclosed to the public must be private, secluded or secret facts and not public ones; and (c) the matter made public must be offensive and objectionable to a reasonable man of ordinary sensibilities under the circumstances.  <u>Nelson v. Glynn-Brunswick Hosp. Auth.</u>, 571 S.E.2d 557, 563 (Ga. Ct. App. 2002).  Defendants argue that there was no public disclosure of private facts.  (FD's Br. [201] 34; Biuso's Br. [194] 21; Hardwell's Br. [195] 21; Bouldin's Br. [196] 20.)[100]  As the following discussion makes clear, defendants are correct.

_____

[100] Plaintiff argues that there was disclosure to the public because "the 'publicity' proscribed by the tort is 'any communication by the defendant to a third person." (Pl.'s Br. [211] 21-22, quoting <u>Restatement (Second) of Torts</u> § 652D, cmt. a.)  However, as defendants correctly show, plaintiff selectively misquotes the <u>Restatement</u>.  The correct language is as follows:

    *a. Publicity.*  The form of invasion of the right of privacy covered in this Section depends upon publicity given to the private life of the individual.  "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation.  "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person.  "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.  The difference is not one of the means of communication, which may be oral, written or

In Mayor & City Council of Richmond Hill v. Maia, 784 S.E.2d 894, 2016 WL 1237359 (Ga. Ct. App. 2016), Maia sued the Mayor and Council of Richmond Hill and Douglas Sahlberg, seeking damages for, inter alia, invasion of privacy after a picture of the injuries her daughter, Sydney Sanders, inflicted upon herself during a suicide attempt was displayed at school. Id. at *1. Sahlberg, an officer with the Richmond Hill Police Department, showed his daughter pictures of the injuries, and classmates testified that she in turn showed them one of the photographs. Id. at *1-2. When Sanders returned to school and learned that the photograph had been displayed, she became distraught and later successfully committed suicide. Id. at *2-3.

In Maia's claim against Sahlberg, she alleged that the confidential photographs of Sanders's person should have remained private and not published or made public to Sahlberg's daughter; that such disclosure was offensive or objectionable to a reasonable person; and that the disclosure harmed Sanders.

---

by any other means. It is one of a communication that reaches, or is sure to reach, the public.

Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

Restatement (Second) of Torts § 652D, cmt. a (1977).

<u>Maia</u>, 2016 WL 1237359, at *8.  After stating the elements of the claim for the public disclosure of private facts, the court summarized the parties' positions. Sahlberg argued, among other things, that there was a lack of evidence sufficient to show a public disclosure in that he only showed the photographs to his daughter.  Maia responded that there is no "mandatory authority" that publication to a single individual cannot meet the public disclosure requirement, and that public disclosure remains an issue of fact that should be resolved by a jury.  <u>Id.</u>

In an interlocutory appeal of the trial court's denial of Sahlberg's motion for summary judgment, the Georgia Court of Appeals wrote as follows:

> Neither party has cited, and we are unaware of, any controlling Georgia authority as to what constitutes a "public disclosure" of a private fact.    However, as explained in the comments to the <u>Restatement of Torts</u> 2d, "to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons" is not sufficient to constitute a public disclosure. <u>Restatement of Torts</u> 2d, § 652D (comment a).  "On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient" to constitute a public disclosure.  <u>Id.</u> Whether oral, written, or by other means, the publicity given to the private life of the individual must be "a communication that reaches, or is sure to reach, the public."  <u>Id.</u>    Here, even if Sahlberg's disclosure was otherwise wrongful, it was a private communication to his daughter and not to the public, nor was the disclosure of the photographs "sure to reach" the public.  See <u>Price v. Scranton Sch. Dist.</u>, Civil Action No. 11-0095, 2012 WL 37090, *14, 2012 U.S. Dist. LEXIS 1651, *47 (M.D. Pa. January 6, 2012) (dismissing invasion of privacy claim based on disclosure of a minor's vaginal infection to students at her school and a neighboring school as "the publication was not so widespread that it was communicated to the

public at large, or to so many people that it was 'substantially certain' to become public knowledge"). The trial court erred in denying the appellants' motion for summary judgment as to this claim.

Maia, 2016 WL 1237359, at *8 (footnote omitted).

In applying those principles here, the undersigned reports that, even if each individual defendant's disclosure of plaintiff's protected health information was wrongful, their communications were private and not to the public. Dr. Bouldin told only Dr. Hardwell. Dr. Hardwell told only Dr. Biuso. Dr. Biuso told only Mr. Stuenkel and Floyd's in-house counsel, Mr. Monk. Without a public disclosure, there is no invasion of privacy claim. See Finnerty v. State Bank & Trust Co., 687 S.E.2d 842, 844 (Ga. Ct. App. 2009) ("Under Georgia law, in order to state a cause of action for invasion of privacy premised on the public disclosure of private facts, there must be a public disclosure in which the information is distributed to the public at large."); Haughton v. Canning, 650 S.E.2d 718, 722 (Ga. Ct. App. 2007) (letter from one doctor to another was not public disclosure).

Although Mr. Stuenkel disclosed information about plaintiff to a larger number of people within the Floyd community, there was no disclosure of embarrassing private facts to the public. As already discussed, on March 17, 2014, Mr. Stuenkel sent an email to Floyd's Executive Leadership Team (about 50 people) attaching a memorandum drafted by Mr. Gorman which stated that

Ms. Scoggins had taken a medical leave of absence from her position as administrator and chief nursing officer of Floyd Polk Medical Center, and wished her a full and prompt recovery.  On March 24, Mr. Stuenkel sent an email to certain Floyd personnel informing them that Ms. Scoggins would not be returning from medical leave.  Initially informing co-workers that someone has taken a medical leave of absence and then updating them that the person is not returning to work is not disclosing embarrassing private facts to the public.

Mr. Stuenkel also gave a general recounting of facts regarding Ms. Scoggins as they occurred to Polk Medical Center, Inc., to the Cedartown-Polk County Hospital Authority, to Floyd's management board, and to Floyd's senior executive team.  Plaintiff has not submitted any evidence about what Mr. Stuenkel said about her in each of those conversations.  Assuming, however, that such conversations disclosed embarrassing private facts, i.e., that Ms. Scoggins had entered a drug addiction treatment program, the recipients were not members of the public, but ones who had a "need to know" about what was going on with one of Floyd's top administrators.  See Pierri v. Cingular Wireless, LLC, 397 F. Supp. 2d 1364, 1382-83 (N.D. Ga. 2005) (rejecting invasion of privacy claim because allegedly embarrassing private fact was not relayed to anyone outside of management who did not have a need to know, and all discussions among defendant's management personnel were made in good faith to enforce

defendant's policies and protect its interests); <u>Eason v. Marine Terminals Corp.</u>, 710 S.E.2d 867, 871 (Ga. Ct. App. 2011) ("when the disclosure is intracorporate or between members of unincorporated groups or associations, and is heard by one who, because of his duty or authority has reason to receive the communication, there is no public disclosure and thus no invasion of privacy"); <u>Johnson v. Metro. Atlanta Rapid Transit Auth.</u>, 429 S.E.2d 285, 288 (Ga. Ct. App. 1993) (communications between top officers within MARTA, pertaining to the operations of MARTA, do not constitute a public disclosure).

Finally, in response to a local newspaper story about this lawsuit, Mr. Stuenkel stated only that Floyd does not comment on pending litigation. He also informed about 150 employees at a Floyd leadership meeting that what they had read in the newspaper was plaintiff's side of the story and that Floyd would vigorously defend itself. On neither of these occasions did Mr. Stuenkel disclose embarrassing private facts about Ms. Scoggins to the public. Instead, it was plaintiff who made embarrassing disclosures of private facts to the public when she filed this lawsuit and the local newspaper published her allegations. Therefore, the undersigned **REPORTS** that plaintiff has failed to establish a claim for public disclosure of embarrassing private facts, and thus **RECOMMENDS** that plaintiff's Motion for Summary Judgment on this part of her invasion of privacy claim be **DENIED**, and that the Motions for Summary

Judgment filed by the Floyd defendants and the defendant doctors on this part of plaintiff's invasion of privacy claim be **GRANTED**.

In summary, the undersigned **RECOMMENDS** that plaintiff's Motion for Summary Judgment on her Invasion of Privacy/Wrongful Disclosure Claim (Count XI) be **DENIED**, and that the Motions for Summary Judgment filed by the Floyd defendants and the defendant doctors on that claim be **GRANTED**.

### 4.    Breach of Contract/Stubborn Litigiousness Against Defendant Floyd Only (Count X)

Both Ms. Scoggins and Floyd seek summary judgment on plaintiff's claim that her termination breached the "for cause" provision of the Employment Agreement.  "As a general rule, '[w]hen an employment contract requires that termination be 'for cause' only, and the employer fires the employee without cause, a substantive breach occurs, and the employee would be entitled to seek full compensatory damages.'"  Salhab v. Tift Heart Ctr., P.C., 581 S.E.2d 363, 365 (Ga. Ct. App. 2003) (quoting Savannah Coll. of Art & Design, Inc. v. Nulph, 460 S.E.2d 792, 793 (Ga. Ct. App. 1995)).  As has already been discussed, there are disputed issues of material fact over whether Floyd had the right to terminate the Employment Agreement for cause.

Plaintiff also seeks expenses of litigation and attorney's fees under O.C.G.A. § 13-6-11.  (Second Am. Compl. ¶ 161.)  Expenses of litigation and attorney's fees may be awarded under that code section if the fact-finder

determines that the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense.  <u>Forsyth Cty. v. Martin</u>, 610 S.E.2d 512, 517 (Ga. Ct. App. 2005).  "Of course, questions concerning bad faith, stubborn litigiousness, and unnecessary trouble and expense under OCGA § 13-6-11 are 'generally questions for the jury to decide.'"  <u>Atlanta Emergency Servs., LLC v. Clark</u>, 761 S.E.2d 437, 441-42 (Ga. Ct. App. 2014) (quoting <u>Martin</u>, 610 S.E.2d at 517).  That is the case here.

Accordingly, the undersigned **RECOMMENDS** that plaintiff's Motion for Summary Judgment on the breach of contract/stubborn litigiousness claim (Count X) be **DENIED**, and that Floyd's Motion for Summary Judgment on those claims be **DENIED**.  A jury should decide whether Floyd breached the Employment Agreement and, if so, whether it has been stubbornly litigious.

## IV.   <u>CONCLUSION</u>

For the reasons explained above, the undersigned **RECOMMENDS** that

defendant Dr. Bouldin's Motion for Summary Judgment [174] be **GRANTED IN PART** and **DENIED IN PART**;

defendant Dr. Hardwell's Motion for Summary Judgment [175] be **GRANTED**;

defendant Dr. Biuso's Motion for Summary Judgment [176] be **GRANTED**;

plaintiff Kimberly J. Scoggins's Motion for Summary Judgment [190] be **DENIED**;

defendant Stuenkel's Motion for Summary Judgment [191] be **GRANTED**; and

defendant Floyd's Motion for Summary Judgment [191] be **GRANTED IN PART** and **DENIED IN PART**.

If the District Court adopts the above recommendations, then only Floyd and Dr. Bouldin will remain as defendants; defendants Dr. Biuso, Dr. Hardwell, and Mr. Stuenkel will be dismissed from this action; and the following claims will remain for trial:

(1)    plaintiff's FMLA interference claim against Floyd (Count I);

(2)    plaintiff's FMLA retaliation claim against Floyd (Count II);

(3)    plaintiff's claim that defendant Dr. Bouldin violated her rights under the statute creating the GPDMP (Count IX), and that Floyd is liable to her for his alleged misconduct under *respondeat superior*; and

(4)    plaintiff's breach of contract/stubborn litigiousness claim against Floyd (Count X).

The Clerk is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED**, this 10th day of June, 2016.


_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE